[Cite as *State v. White*, 2016-Ohio-1405.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 15AP-565 |
| v. | : | (C.P.C. No. 14CR-2910) |
| Anthony White, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 31, 2016

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton,* for appellee. **Argued:** *Michael P. Walton*

**On brief:** *Carpenter Lipps & Leland, LLP, Kort Gatterdam,* and *Erik P. Henry,* for appellant. **Argued:** *Erik P. Henry*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Anthony White, appeals a conviction from the Franklin County Court of Common Pleas entered following a trial on the offenses of burglary, felonious assault, improperly discharging a firearm into a habitation, and possessing a weapon while under a disability, each with appropriate repeat violent offender and weapon specifications. We find that, even if some of the issues White raises on appeal disclose errors at trial, there is no reasonable probability that such errors affected his trial's ultimate outcome. Thus, we do not find plain error or that White was prejudiced by the effectiveness of his counsel so as to cause reversal of the judgment of the trial court. While some errors may exist, we find them to be harmless as not affecting the outcome of the trial. Therefore, we affirm the judgment of the trial court.

No. 15AP-565

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2}   On June 2, 2014, a grand jury indicted White for burglary, felonious assault, improperly discharging a firearm into a habitation, and possessing a weapon while under a disability due to prior felony convictions.  The burglary, felonious assault, and weapon discharge counts each were enhanced by repeat violent offender specifications and the felonious assault, weapon discharge, and weapon under disability offenses were each enhanced by firearm specifications.  White pled not guilty on June 4, 2014, and on March 2, 2015, the Franklin County Court of Common Pleas held a jury trial on the case.

{¶ 3}   At the start of trial, White waived his right to a jury on the weapon under disability charge and stipulated to the predicate prior convictions for that count and the repeat violent offender specifications so that the jury would not hear testimony about his prior record.   However, after voir dire and opening, White and a trial witness against him were being transported to the courthouse on the same prison bus, and White allegedly threatened to kill the witness if she testified against him, saying he should have killed her at the time of the original offenses.  As a consequence, the prosecution indicated an intention to call a witness to the threat as well as ask the threatened person herself about the nature of White's threat.   The prosecution noted that this would unfortunately make it apparent to the jury that White was presently incarcerated, but it considered testimony about White's attempt to silence the witness as relevant to show consciousness of guilt. The defense voiced an objection, but the trial court agreed that if White had made such threats while in custody he had chosen by his conduct to risk that the jury would learn that he was incarcerated during the trial. The trial court permitted the testimony to be introduced.

{¶ 4}   A Columbus Division of Police patrol officer was the first witness to testify in the trial.   He explained that on October 20, 2013 at 3:20 a.m., he was dispatched to 2330 Westbelt Drive, which is the address of a motel called the Royal Inn Motel.  He testified that he arrived within one minute of the dispatch call because he happened to be parked in his cruiser approximately 100 yards away.   When he arrived, there was no sign of activity, but there was a motel room window with a bullet hole. So he knocked on the door of that room.   Ultimately, he spoke to Jennifer Nunez and thereafter briefly with a man who had been shot in the arm, Antonio Paredes.  Paredes was in too much pain to

speak much. However, Nunez, though apparently agitated from the events, explained what had happened. The defense objected, but the trial court allowed the officer to state what Nunez had told him as an excited utterance. She stated that White was the shooter. Her subsequent explanations of her relationship with White and what had happened were admitted with a limiting instruction to show the course of the officer's investigation, not the truth of what was asserted.

{¶ 5} The officer testified that Nunez told him that White had shot Paredes and she knew White because he had stalked her. Nunez told the officer that she awoke in the night to a knock on the motel room door. She looked through the peephole and saw a woman she did not recognize. The woman said she was stranded and wanted to use a telephone to call her husband. Nunez let her in and allowed her to use her phone. But once the woman was inside, Nunez began to recognize her as an acquaintance of White. Nunez knew the woman as "Dee-Dee," who became nervous when she realized Nunez had recognized her. (Tr. Vol. II, 125.) "Dee-Dee" announced that she needed to leave, and she did leave. As Nunez looked out the door and watched "Dee-Dee" leave, she saw White appear with a gun and heard a gunshot. The officer found one bullet casing outside the motel room, one gunshot wound in Paredes, and one hole in the window. The officer also testified that the area was fairly well lit.

{¶ 6} "Dee-Dee," whose full name is Diana Thompson, testified next. (Tr. Vol. II, 149.) She admitted that she was, at the time of trial, incarcerated for burglary in connection with the crime for which White was on trial and that she had previously committed a series of crimes to buy drugs for her opiate addiction. Thompson also testified at length about the plea deal she entered into with the State to avoid potentially 22 years in prison by agreeing to testify against White.

{¶ 7} Thompson explained that she had known White for approximately six months to one year prior to October 2013. According to Thompson, White telephoned her on October 20, 2013 and told her he needed her help. White explained that he needed Thompson to drive with him because he had broken up with his ex-girlfriend and he needed someone to help him pick up his Cadillac. Thompson testified that White promised drugs in exchange for her help. While enroute to the motel, White revealed that he knew Nunez was at the motel with the help of a cell phone application, but he did

No. 15AP-565

not know which room she was in. For this reason, Thompson would have to knock on the doors near where the Cadillac was parked to discover Nunez' exact location.

{¶ 8} Once the pair arrived at the motel, Thompson left her cell phone with White with the idea that she would call her cell phone from the motel room so that Nunez would not recognize White's number if she watched Thompson dial. Thompson did as planned, knocked on the door, gained admittance, and telephoned her own cell phone number in order to reach White. White answered. Thompson pretended she was talking to her husband and stated what room she was in. But after hanging up, Nunez began acting nervous and directed Thompson that when her "husband" came, she should not open the door immediately, but allow Nunez to look through the peephole first. At that point, it appeared to Thompson that the plan would not work because, if Nunez looked through the peephole, Thompson assumed she would not open the door for White. Thompson therefore left to go inform White that his plan had failed.

{¶ 9} When Thompson returned to White's car and spoke to White, he was angry and accused Thompson of messing up everything. He ordered her to get out of the car and go back with $10 supposedly to thank Nunez for using the phone with the idea that White would be close behind Thompson this time. But when she and White got out of the car and walked around the corner to the motel, Nunez looked out of the hotel door and saw them both. Nunez slammed the door; White, who was slightly trailing Thompson, went around Thompson to near the door of the room, raised his arm, and fired a shot. Then both Thompson and White ran from the scene back to the car. Thompson admitted she knew White carried a gun but did not know he had it that night or that he intended to use it.

{¶ 10} The prosecution then questioned Thompson about the threat incident that occurred while both she and White were in custody near the start of the trial. Thompson testified that she had had contact with White during the trial because they are in the same vicinity in the jail, twice they've been on the same bus, and once they were even brought along the same corridor and up the same elevator to the courtroom together. Thompson stated that on each occasion when she and White came into contact with one another, White asked her not to say anything about him so he would not get in trouble. On the morning of the day of her testimony, when she refused him again, he said he should have

No. 15AP-565

killed her and kept repeating that he was going to kill her. According to Thompson, White said, "I'm going to fucking kill you, bitch." (Tr. Vol. II, 190.) He added, "I should have killed you that night." (Tr. Vol. II, 190-91.)

{¶ 11} After a witness testified to establish a foundation for certain jail calls used later as exhibits in the case, another prisoner who had been a witness to the threats against Thompson testified. This corroborating witness admitted she was under indictment for a felony and had a history of theft offenses. This witness testified that she was on the same bus with Thompson and White traveling from the Franklin County Jail to the courthouse. She said that White questioned Thompson about whether she intended to testify against him and that, when she indicated her intention to do so, White became very angry and screamed, probably 20 times, that he would kill her and that he should have killed her on the night of the original offense.

{¶ 12} Nunez testified next. Nunez testified that she met White when she sold him a Chevy Tahoe and that they ultimately became involved in a romantic relationship. However, when she ended the relationship with White, he took it very badly. White drove by her house often and telephoned frequently. On one occasion he knocked on the door at 4:00 a.m. and hit her. On another occasion, he broke into her house and stole her television sets. In the end, his threats (for example, to burn her house down) and other behavior led her to stay in the motel where the shooting took place. Nunez admitted that she rented the motel room under her own name and had parked the Cadillac (which did not, in fact, belong to White) in front of the room.

{¶ 13} Nunez testified concerning the charges against White, that late one night while at the motel, a woman came to the door asking to use the telephone in the room because she was stranded and it was cold out. Nunez let her in and allowed her to use the phone, but she began to think that something did not feel right. Nunez therefore asked a number of questions about whether the woman knew White. After a time, the woman left saying she was going to wait for her husband at the Waffle House, but when she left she did not walk in the direction of the Waffle House. At that point, Nunez concluded that this woman was affiliated with White. She called her mother to say that White had found her, and she made plans to hide at her mother's house. She gathered her things, told Paredes to keep watch, and she opened the door to dash to her car. However, when she

opened the door, she saw the woman returning with White trailing behind. She yelled at Paredes to get away from the window and slammed the door as a shot rang out.

{¶ 14} She testified that she telephoned 911. Initially, she did not realize that Paredes had been shot, but during the call it became apparent. A recording of the call was played for the jury and introduced as an exhibit at trial. In the recording, Nunez sounds panicked but gives a detailed recounting of what happened including identifying White by name.

{¶ 15} Nunez testified that it was not until later that she realized that she still had location services on her phone set to allow friends to determine her location using GPS, and she hypothesized that this may have been how White found her. She identified White immediately from prior experience with him and was also able to identify Thompson from a photograph array prepared by the police.

{¶ 16} Nunez explained that she had received several phone calls from White and White's family attempting to dissuade her from testifying. She said White even had a man come to see her, who she knows only as "Tim-Tim," to obtain a letter from her recanting her identification of White which "Tim-Tim" then took somewhere for someone to apply a notary stamp. (Tr. Vol. II, 269.) Nunez testified that, although the letter has a notary stamp, she was not present when the notary stamp was applied and that the letter is a lie. At trial, three calls from jail between White and "Tim-Tim" were played. Nunez identified the speakers in the calls. In the calls, White instructs "Tim-Tim" to do what needs to be done, bribery or kidnapping, in order to ensure that Nunez and Paredes do not appear at trial or ensure that the charges are dropped. Nunez admitted, however, that she had voluntarily gone to see White on two occasions at the jail, but claimed this was in the hope of recovering the televisions White had taken from her home.

{¶ 17} Nunez was the final witness to testify for the prosecution. The defense did not present any witnesses. On March 4, 2015, following closing arguments and the jury charge and deliberation (including a number of difficulties the jury had completing the appropriate portions of the verdict forms), the jury delivered a verdict of guilty on all counts and specifications submitted to it. Specifically, the jury found White guilty of burglary, felonious assault with a gun specification, and discharging a firearm at or into a

No. 15AP-565

habitation with a gun specification. Following the jury's verdict, the trial court found White guilty of having a weapon while under a disability with a gun specification.

{¶ 18} On June 1, 2015, the trial court held a sentencing hearing. As part of the sentencing hearing, the trial court found White to be a repeat violent offender as specified in Counts 1 through 3 of the indictment. The trial court sentenced White to a total of 24 years at the Ohio Department of Rehabilitation and Correction. The sentence consisted of 8 years as to each of the counts for burglary, felonious assault, and discharging a weapon into a habitation, to be served concurrently with one another (for a total of 8 years); 3 years for the weapon under disability offense, to be served consecutively with the previous 3 counts (for a cumulative total of 11 years); a consecutive 7 years total as to the court's findings on the repeat violent offender specifications (for a cumulative total of 18 years); and 3 years as to each of the three firearm specifications for felonious assault, discharging a weapon into a habitation and having a weapon under disability, requiring that the 3 specifications be served as 2 consecutive specifications and consecutively to the rest of the sentence (for a cumulative and final total of 24 years).[1]

{¶ 19} White now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 20} White assigns six assignments of error for our review:

> FIRST ASSIGNMENT OF ERROR: THE ADMISSION OF OTHER-ACTS TESTIMONY VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.
>
> SECOND ASSIGNMENT OF ERROR: APPELLANT WAS DENIED HIS RIGHTS TO THE PRESUMPTION OF INNOCENCE, TO A FAIR TRIAL AND TO DUE PROCESS CONTRARY TO THE OHIO AND UNITED STATES CONSTITUTIONS WHEN THE JURY HEARD EVIDENCE OF APPELLANT'S INCARCERATION PRIOR TO TRIAL.
>
> THIRD ASSIGNMENT OF ERROR: APPELLANT'S RIGHTS TO CONFRONT THE WITNESSES AGAINST HIM, TO A FAIR TRIAL, AND TO DUE PROCESS AS GUARANTEED BY

---

[1] R.C. 2929.14 requires that sentences for specifications must be served first and are to be imposed consecutively with the underlying offenses.

No. 15AP-565

THE U.S. AND OHIO CONSTITUTIONS WERE VIOLATED BY THE ADMISSION OF HEARSAY EVIDENCE.

FOURTH ASSIGNMENT OF ERROR: THE TRIAL COURT IMPROPERLY INSTRUCTED THE JURY ON FELONIOUS ASSAULT AND BURGLARY IN VIOLATION OF APPELLANT'S DUE PROCESS RIGHTS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.

FIFTH ASSIGNMENT OF ERROR: APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

SIXTH ASSIGNMENT OF ERROR: THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED A JUDGMENT OF CONVICTION BASED ON INSUFFICIENT EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE Ohio CONSTITUTION.

For clarity of analysis, we address these out of order.

## III. DISCUSSION

### A. Sixth Assignment of Error – Sufficiency and Weight of the Evidence

{¶ 21} The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * * declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. We address sufficiency first.

#### 1. Sufficiency

{¶ 22} Sufficiency is:

"a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

No. 15AP-565

*Volkman* at ¶ 11, quoting *Thompkins* at 386; *Black's Law Dictionary*, 1433 (6th Ed.1990). "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991) paragraph two of the syllabus.

{¶ 23} As potentially relevant to this case, the offense of burglary is defined as follows:

> (A) No person, by force, stealth, or deception, shall do any of the following:
>
> * * *
>
> (2) Trespass in an occupied structure * * * that is a * * * temporary habitation of any person when any person other than an accomplice of the offender is present * * * with purpose to commit in the habitation any criminal offense.

R.C. 2911.12. At trial the prosecution argued that White was guilty of burglary because he was complicitous to Thompson's trespass by deception into the motel room. In relevant part, R.C. 2923.03 defines complicity as follows:

> (A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
>
> (1) Solicit or procure another to commit the offense;
>
> (2) Aid or abet another in committing the offense;
>
> (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
>
> (4) Cause an innocent or irresponsible person to commit the offense.
>
> * * *
>
> (C) No person shall be convicted of complicity under this section unless an offense is actually committed, but a person may be convicted of complicity in an attempt to commit an offense in violation of section 2923.02 of the Revised Code.

{¶ 24} Both Thompson and Nunez testified that Thompson deceived Nunez with a story about being stranded and needing to use the phone with the result that Thompson was able to trespass in the motel room (temporary habitation) rented by Nunez.

No. 15AP-565

Thompson testified that White drove her to the motel and asked her to learn which was Nunez' motel room and deceive her to gain access her room.

{¶ 25} The evidence presented at trial does not make clear that Thompson herself had a "purpose to commit in the habitation any criminal offense." R.C. 2911.12(A)(2). Thompson testified that White had told her they were there to pick up the keys to his other car, that she did not know White was armed, and that she had no idea he was intending to use a firearm. However, even assuming that the evidence were to be interpreted to show that Thompson herself lacked the requisite intent for burglary,[2] the evidence would still be clear that White intended to commit a crime and did so by using Thompson. His entire plan with Thompson was designed to locate Nunez and then (perhaps unbeknownst to Thompson but evidenced by White's behavior when he finally saw Nunez) to shoot at her and her paramour, Paredes. In short, whether Thompson is the primary perpetrator, or an "innocent or irresponsible person," White used her to help him pinpoint Nunez' location (which involved a trespass by deception) with the intent to commit a crime—i.e., assaulting Nunez and/or her companion who were in a temporary habitation. The evidence was therefore sufficient to show that White was guilty of complicity to burglary and, thus, liable to "be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F).

{¶ 26} While an argument could be made that if Thompson did not have the necessary mens rea for burglary, then in some sense White did not, in fact, "[c]ause [her] to *commit the offense*." (Emphasis added.) R.C. 2923.03(A)(4). However, this argument would render R.C. 2923.03(A)(4) self-contradictory. That is, R.C. 2923.03(A)(4) extends "complicity" to offenders who, "[c]ause an innocent or irresponsible person to commit the offense." But "innocent" persons, by literal definition, cannot have "commit[ted]" any offense. *See Black's Law Dictionary* 909 (10th Ed.2014). Thus, in order for R.C. 2923.03(A)(4) to avoid being self-contradictory, it must be read in the context of the whole and with the presumption that a reasonable result was intended. *See* R.C. 1.47.

---

[2] Although Thompson pled guilty to burglary which suggests she did have criminal intent, evidence of her conviction and plea should not have been admissible against White to prove the facts underlying the conviction. Evid.R. 803(22) (permitting evidence of a final judgment to "prove any fact essential to sustain the judgment, but not including, when offered by the Government in a criminal prosecution for purposes other than impeachment, judgments against persons other than the accused").

Read as a whole, R.C. 2923.03(A)(4) creates criminal liability for persons who "acting with the kind of culpability required for the commission of an offense, * * * [c]ause an innocent or irresponsible person to commit the offense." In other words, the mens rea needs to be held, in R.C. 2923.03(A)(4), by the complicit person, not necessarily the primary innocent actor. The sensible reading of this provision is, therefore, that it attaches culpability to a person with the requisite intent based on the fact that they cause an innocent or irresponsible person to take actions which, if such person held the requisite intent, would constitute a crime.

{¶ 27} Analogously, we consider a similar case where the person who physically accomplished the acts forming the basis of the offense for the complicitous defendant lacked the necessary mens rea. In *State v. Kulchar*, 4th Dist. No. 10CA6, 2015-Ohio-3703, the Fourth District Court of Appeals held that sufficient and weighty evidence supported the complicitous defendant's conviction for tampering with evidence even though the person who actually destroyed potential evidence was not aware that it was potentially evidence. In *Kulchar*, the defendant was arrested on suspicion of having forced a fellow university classmate to have sex with him. *Kulcher* at ¶ 8-9, 11. While under arrest, the defendant sent a number of text messages to his roommate asking the roommate to dispose of a particular pair of boxer shorts. *Id.* at ¶ 11. The roommate was apparently unaware of the allegations against the defendant and the defendant did not explain the reasons for the request. *Id.* at ¶ 10. The roommate did dispose of the boxer shorts, and the defendant was, on that basis, convicted of tampering with evidence. *Id.* at ¶ 8. Even though the roommate could not have been said to have committed the tampering offense (because he lacked the requisite "purpose to impair [the] value or availability" of the boxer shorts as evidence) the Fourth District affirmed the defendant's conviction as sufficiently supported and not against the manifest weight of the evidence. *Id.* at ¶ 37; R.C. 2921.12(A)(1). The Fourth District also affirmed an instruction that the " 'innocent person,' i.e. [the roommate], who [the defendant] allegedly caused to tamper with evidence 'did not have to have the mental elements of purpose or knowingly.' " *Kulchar* at ¶ 19, quoting the trial court and R.C. 2923.03(A)(4).

{¶ 28} In this case, the evidence presented at trial may not have sufficiently established that Thompson had an intent to commit a crime when she used deception to

get into the motel room, but the evidence shows that White had the necessary intent. The Cadillac in front of the room (which Thompson testified she thought she was there to retrieve) did not, in fact, belong to White. So even if White had initially intended to take the car (as he apparently represented to Thompson) that would have been a crime and the keys to the car were presumably with Nunez in the room; thus, part of the crime would have taken place in the habitation. Moreover, White drew his gun and fired into the room as soon as he saw Nunez, which suggests that that is what he had intended to do when he determined (with Thompson's help) what room Nunez was in and could see her. According to R.C. 2923.03(A)(4), White's intent is sufficient even without proof of Thompson's intent. As Justice Joseph Story put it, "it is the known and familiar principle of criminal jurisprudence, that he who commands, or procures a crime to be done, if it is done, is guilty of the crime, and the act is his act. This is so true, that even the agent may be innocent, when the procurer or principal may be convicted of guilt, as in the case of infants, or idiots, employed to administer poison." *United States v. Gooding*, 25 U.S. 460, 469 (1827); *see also, e.g.*, *State v. Champion*, 2d Dist. No. 23451, 2010-Ohio-2390, ¶ 31-41.

{¶ 29} Felonious assault is defined in the Revised Code in relevant part as follows:

(A) No person shall knowingly do either of the following:

(1) Cause serious physical harm to another * * *;

(2) Cause or attempt to cause physical harm to another * * *
by means of a deadly weapon or dangerous ordnance.

R.C. 2903.11(A). "Serious physical harm" is, in relevant part, "[a]ny physical harm that involves acute pain of such duration as to result in substantial suffering." R.C. 2901.01(A)(5)(e). "Physical harm" to a person consists of "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶ 30} In this case, both Nunez and Thompson testified that White fired a gun into the motel room through the window. In addition, both Nunez and the police officer who arrived on the scene testified that Paredes was shot in the arm. Although White argues in his brief that no doctors testified to the extent of Paredes' injuries, the police officer testified that Paredes acted as if he were in pain and had difficulty answering questions. This evidence is sufficient to find that White was guilty of felonious assault.

No. 15AP-565

{¶ 31} As relevant to the facts of this case, a person is guilty of improperly discharging a firearm at or into a habitation when that person "without privilege to do so," "knowingly * * * [d]ischarge[s] a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual." R.C. 2923.161(A)(1) .

{¶ 32} Nunez testified in this case that she was living at the motel and that the room was rented in her name. She testified that she and Paredes were in the room at the time of the shot. Both Nunez and Thompson testified that White fired a gun into the motel room. The police officer testified that he discovered Paredes with a bullet wound in his arm, a bullet hole in the window of the motel room, and an empty casing outside of the room. This is sufficient for a jury to find White guilty of a violation of R.C. 2923.161.

{¶ 33} The Ohio Revised code forbids a person to "knowingly acquire, have, carry, or use any firearm" if, among other circumstances, the person "has been convicted of any felony offense of violence." R.C. 2923.13(A)(2).

{¶ 34} White stipulated that he had been convicted of the necessary predicate offenses to be forbidden from knowingly acquiring, having, carrying, or using a firearm. Thompson testified that White often carried a gun, and Thompson and Nunez testified that White shot into the motel room. In addition, the police officer testified that he observed a bullet hole in the motel window, a bullet wound in Paredes' arm, and recovered a shell casing in front of the motel room. This is sufficient for the court to have found White guilty of a violation of R.C. 2923.13, having a weapon while under disability due to a prior felony conviction.

### 2. Manifest Weight

{¶ 35} Addressing manifest weight of the evidence, we quote the following:

> Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."

(Emphasis deleted.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's Law Dictionary* 1594 (6th Ed.1990). In a manifest weight analysis, "the appellate court sits as a 'thirteenth

juror' and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388, quoting *Tibbs v. Florida.*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 36} In this case, two witnesses, both of whom knew White well and yet did not know each other, testified that on October 20, 2013, White shot into Nunez' motel room at the Royal Inn, injuring Paredes. Their testimony about what occurred as a prelude to the shooting was consistent. Their account of how White shot from outside the motel into Nunez' room was roughly corroborated by the physical evidence observed by the police officer at the scene. White offered no witnesses, testimony, or evidence in his own defense. Under these circumstances, notwithstanding the fact that both witnesses had felony records, with one witness having been afforded a plea deal in exchange for her testimony, White's conviction was clearly not against the manifest weight of the evidence.

{¶ 37} White's sixth assignment of error is overruled.

## B. Third Assignment of Error – Whether Admission of Evidence Under the Excited Utterance Exception was Error

{¶ 38} White argues that the trial court erred in permitting testimony about what Nunez reported to the police officer who responded to the scene at the Royal Inn, denying the defense's objection to the State's use of the hearsay exception for excited utterances. "As with other evidentiary rulings, the determination whether hearsay statements are subject to exception rests within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion." *State v. Canada*, 10th Dist. No. 14AP-523, 2015-Ohio-2167, ¶ 27; *see also State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 92; *but see Neff Sand & Gravel, Inc. v. Great Lakes Crushing, Ltd.*, 11th Dist. No. 2012-L-145, 2014-Ohio-2875, ¶ 23, stating that de novo review is applied to the question of whether a statement is hearsay.

{¶ 39} " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" and is generally a forbidden form of evidence. Evid.R. 801(C); Evid.R. 802.

No. 15AP-565

However, one permitted form of hearsay is the excited utterance, that is, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Evid.R. 803(2).

> A four-part test is applied to determine the admissibility of statements as an excited utterance:
>
> (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement of declaration spontaneous and unreflective,
>
> (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,
>
> (c) that the statement or declaration related to such startling occurrence or the circumstances of such starling occurrence, and
>
> (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.

(Emphasis deleted.) *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 166, quoting *Potter v. Baker*, 162 Ohio St. 488 (1955), paragraph two of the syllabus.

{¶ 40} In this case, the responding law enforcement officer testified that he arrived at the scene less than one minute after being dispatched because he was in the close vicinity of the incident.  When he arrived, Nunez was "scared, kind of in a panic, appeared to be in shock from what just occurred. * * * She was kind of all over the place, just she couldn't really calm down." (Tr. Vol. II, 123.)  What had just happened, of course, was that she had been shot at and her paramour, Paredes, had been shot by White.  We find that her initial statements to the officer about who had shot at them and her theories as to why, meet this exception.  Moreover, in her recorded 911 call, which was even closer in time to the event in question and in which her state of panic is apparent, she related essentially the same information, identifying White as the shooter and explaining that he

had been stalking her for some time. Thus, even had Nunez calmed down sufficiently to regain control over her reflective faculties by the time the officer arrived (a supposition which is not supported by the officer's testimony) she said nothing that she did not also say while clearly in the grip of her initial panic on the 911 call. Accordingly, any error in that regard would be harmless beyond a reasonable doubt. *See State v. DeMarco*, 31 Ohio St.3d 191, 195 (1987); *State v. Rahman*, 23 Ohio St.3d 146, 150 (1986).

{¶ 41} However, Nunez' detailed statements to the police officer about the prelude to the shooting and her interaction with Thompson do not meet any hearsay exception. While Nunez' interaction with Thompson may relate as a precursor to the startling event of the shooting, the facts of this case do not support the use of the hearsay exception for this particular set of facts. At the core of the hearsay exception is the notion that the declarant's statements are likely to be trustworthy about the startling event, because the event was "sufficient to still [her] reflective faculties and thereby make [her] statements and declarations the unreflective and sincere expression of [her] actual impressions and beliefs." *Jones* at ¶ 166. Once the interaction with Thompson ended and Thompson left the premises, an interval of time elapsed in which Nunez packed her things and called her mother, all before the time White arrived with Thompson and shot into the room. Even the trial court seemed cognizant of the difficulty in using the excited utterance exception to permit hearsay testimony about the interaction between Thompson and Nunez and the ruse that ultimately led to the shooting. As such, the trial court delivered a limiting instruction to the jury:

> Ladies and gentlemen, what [the officer is] relating to you is the statements that were said to him. This is in the furtherance of his investigation. That's the only reason you can consider it at this time. You still have to judge the witnesses that may have made those statements.

(Tr. Vol. II, 126.) However, the lack of testimony about how Nunez' detailed description of what happened with Thompson motivated or changed the investigation leads us to conclude that the prosecution (as forbidden by the hearsay rules) used the police officer's testimony for the purpose of demonstrating the truth of the matter asserted. The trial court erred in permitting the officer to testify regarding Nunez' statements about her interaction with Thompson prior to the startling event of the shooting. However, because Nunez and Thompson each appeared and testified in the case about their interaction,

No. 15AP-565

largely corroborating one another, and because the police officer's testimony added no additional facts to what Thompson and Nunez testified to, such error was harmless beyond a reasonable doubt.  S*ee also DeMarco* at 195; *Rahman* at 150.

{¶ 42} White makes the point that corroboration by a police officer can constitute persuasive evidence to a jury.  However, on the facts of this case, the police officer's testimony about the interaction between Thompson and Nunez was a cumulative recital of what Nunez told him, and these facts were entered into the record from the original sources.  While needlessly cumulative evidence may be excluded under Evid.R. 403(B), the issue here is whether White's substantial rights were affected by permitting this hearsay. Crim.R. 52(A).[3]  Because the evidence was before the jury from other legitimate sources, we find that his substantial rights were not affected.

{¶ 43} White's third assignment of error is overruled insofar as the excited utterance exception was properly applied by the trial court. We acknowledge that the trial court erred in permitting testimony by the police officer about Nunez' interaction with Thompson before the shooting.  However, we find that error to be harmless, and we will not reverse on the error.

## C.  Plain Error Standard

{¶ 44} Many of the alleged errors raised by White concern matters that were not objected to before the trial court.  Thus, they may be reviewed for plain error. The Supreme Court of Ohio recently described the "plain error" inquiry:

> Crim.R. 52(B) affords appellate courts discretion to correct "[p]lain errors or defects affecting substantial rights" notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court. However, the accused bears the burden of proof to demonstrate plain error on the record, and must show "an error, i.e., a deviation from a legal rule" that constitutes "an 'obvious' defect in the trial proceedings." However, even if the error is obvious, it must have affected substantial rights, and "[w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." The accused is therefore required to demonstrate a reasonable probability that the error resulted in prejudice—the same

---

[3]  Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded [as harmless error].

deferential standard for reviewing ineffective assistance of counsel claims.

(Citations omitted.) *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22; *see also, e.g.*, *State v. Lynn*, 129 Ohio St.3d 146, 2011-Ohio-2722, ¶ 13; *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

### D. First Assignment of Error – Whether the Admission of Testimony Regarding White's Other Bad Acts Violated His Right to Due Process and Fair Trial

{¶ 45} White argues that the trial court erred by permitting witnesses to testify about White's history of violence, abuse, and stalking and allowing Thompson to testify that White was her drug dealer and had offered her drugs for her participation in the offense.

{¶ 46} Courts in the United States have long recognized that an accused is not to be convicted of a crime based upon proof of other misdeeds showing that the accused is of poor character. *State v. Jamison*, 49 Ohio St.3d 182, 184-85 (1990); *Boyd v. United States*, 142 U.S. 450, 458 (1892). The Ohio Rules of Evidence articulate this principle:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Evid.R. 404(B).

{¶ 47} The evidence by Thompson about White's offer to pay her in drugs could be found to be permissible as evidence of a plan between them. Testimony offered by Nunez and the responding police officer about White's history with Nunez could be found to be permissible as evidence to prove White's continuing motive to stalk and harm Nunez. However, these issues need not be definitively decided, because there is no likelihood that the evidence in question affected the outcome of the trial.

{¶ 48} Two unrelated witnesses, both of whom knew White well, saw him commit the offenses, testified against him, and their testimony not only corroborated each other, but also was consistent with the evidence of physical conditions observed by the police officer at the scene. Our discussion of sufficiency and weight did not use the evidence to which White now objects but still reached the conclusion that the conviction was fully

No. 15AP-565

substantiated and justified by the weight of the evidence. Accordingly, the error in admitting this testimony, even assuming there was error, did not constitute plain error.

{¶ 49} White's first assignment of error is overruled.

### E. Second Assignment of Error – Whether White was Denied the Presumption of Innocence and a Fair Trial by the Revelation to the Jury that he was Incarcerated Prior to and During Trial

{¶ 50} White argues that the trial court erred in permitting testimony that tended to show he was incarcerated. Specifically, White argues that witnesses should not have been permitted to testify about the threats made by him on the jail bus, that calls made by him from the jail procuring the help of an associate to bribe or kidnap witnesses should not have been played, and that Nunez should not have been permitted to testify that she visited him at the jail in an attempt to recover the televisions he stole from her.

{¶ 51} The Supreme Court has held that threats against witnesses or the prosecutor are appropriate evidence of a consciousness of guilt. *State v. Richey*, 64 Ohio St.3d 353, 357 (1992). Moreover, in a case where a somewhat similar assignment of error was raised concerning threats by an incarcerated defendant against an incarcerated witness, this court reasoned:

> In appellant's view, use of [an incarcerated witness]'s statements were nothing more than the state's "blatant attempt" to present evidence of another crime or bad act to portray him as a bad person in front of the jury. In response to appellant's challenge to the admission of this evidence, appellee argues that the trial court properly admitted the testimony as consciousness of guilt. We agree with appellee.
>
> In *State v. Exum*, 10th Dist. No. 05AP-894, 2007-Ohio-2648, the trial court allowed, over objection, the prosecution to question a witness about an incident in the jail where the defendant yelled to the witness, "You snitching bitch," loud enough for other inmates to hear. *Id.* at ¶ 22. In finding no error in the trial court's admission of the evidence, this court stated, "Under Ohio law, 'evidence of threats or intimidation of witnesses reflects a consciousness of guilt and is admissible as admission by conduct.' " *Id.* at ¶ 23, quoting [*State v. Soke*, 105 Ohio App.3d 226, 250 (8th Dist. 1995)].
>
> * * *
>
> After review of the challenged testimony, we find such testimony constitutes evidence of a threat or intimidation of a witness that reflects a consciousness of guilt and is admissible

No. 15AP-565

> by conduct. *Exum* at ¶ 23. Therefore, we conclude the trial
> court did not abuse its discretion by admitting such evidence.

*State v. Parnell*, 10th Dist. No. 11AP-257, 2011-Ohio-6564, ¶ 32-35.

{¶ 52} White's threats against Thompson were much more explicit and violent in nature than those considered in *Parnell* or *Exum*. Clearly, testimony about such threats was appropriate evidence of White's consciousness of guilt, even at a cost of revealing to the jury that White was incarcerated during the trial. The same analysis applies to the jail telephone calls played at trial in which White's voice could be identified and heard instructing an associate to bribe or kidnap witnesses to ensure that they would not come to trial. It was not error to permit this "jailhouse testimony" as evidence of White's consciousness of guilt.

{¶ 53} We note that no objections were raised at trial concerning White's jail calls and Nunez' testimony about visiting White in the jail. Therefore, applying the plain error standard under *Rogers* at ¶ 22, we make three holdings. First, admission of the jail calls was not error because that was appropriate evidence of consciousness of guilt; second, by the time Nunez testified and the recorded jail calls were played for the jury, Thompson and the other inmate witness had testified about the threats on the prison bus and had already made clear that White was incarcerated; and third, even if the admission of this evidence was found to be error, the error would not be plain. This is because there is no reasonable probability that in the face of the other significant evidence against White the outcome would have been affected.

{¶ 54} White's second assignment of error is overruled.

## F. Fourth Assignment of Error – Whether the Trial Court Improperly Instructed the Jury

{¶ 55} White argues that the trial court erred in failing to instruct the jury on the definition of "physical harm," "trespass," and the element of "causation" when it provided the jury instructions. White also concedes that defense counsel at trial did not request such instructions or object to jury instructions given without explicit legal definitions of these terms. A review of the instructions indicates that the trial court did not define those terms for the jury and that defense counsel explicitly turned down an opportunity to object to the charge. Trespass is an element of burglary and is separately defined ("criminal trespass") in R.C. 2911.21(A); physical harm is an element of one of a variety of

No. 15AP-565

forms of felonious assault; causation is an element of complicity as well as applicable forms of felonious assault. R.C. 2903.11(A); R.C. 2911.12(A)(2); R.C. 2923.03(A)(4).

{¶ 56} "As a general rule, a defendant is entitled to have the jury instructed on all elements that must be proved to establish the crime with which he is charged." *State v. Wamsley*, 117 Ohio St.3d 388, 2008-Ohio-1195, ¶ 17, quoting *State v. Adams*, 62 Ohio St.2d 151, 153 (1980). However, "in *Adams*, [the Supreme Court] held that the failure to instruct on each element of an offense is not necessarily reversible as plain error. *Id.* at paragraph two of the syllabus. Rather, an appellate court must review the instructions as a whole and the entire record to determine whether a manifest miscarriage of justice has occurred as a result of the error in the instructions. *Id.* at paragraph three of the syllabus." *Wamsley* at ¶ 17.

{¶ 57} "Trespass" is an element of burglary as defined in R.C. 2911.12(A).[4] R.C. 2911.10 provides that, for purposes of R.C. 2911.11 to 2911.13, "the element of trespass refers to a violation of section 2911.21 of the Revised Code" ("criminal trespass"). "Criminal trespass" (which supplies the definition for "trespass" for the offense of burglary) is thus defined to include:

> (A) No person, without privilege to do so, shall do any of the following:
>
> (1) Knowingly enter or remain on the land or premises of another;
>
> (2) Knowingly enter or remain on the land or premises of another, the use of which is lawfully restricted to certain persons, purposes, modes, or hours, when the offender knows the offender is in violation of any such restriction or is reckless in that regard[.]

---

[4] The offense of burglary as defined in R.C. 2911.12 and as used in Count 1 of the indictment is:

> (A) No person, by force, stealth, or deception, shall do any of the following:
> * * *
>
> (2) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense[.]

R.C. 2911.21. It is not clear from the record, nor does White explain, how the trial court's failure to instruct on this definition of trespass created a reasonable probability of prejudice to him. There is no dispute of the fact that the motel room was occupied by Nunez and Paredes. Moreover, Nunez made it clear by her testimony that White did not have permission to enter her motel room.

{¶ 58} This testimony leaves little room for inferences other than that Nunez did not want White there. It is also clear that White understood he was not welcome or permitted in her motel room, since he coopted Thompson to use deception to gain access to Nunez' motel room. No instruction on the legal definition of "trespass" would have clarified this evidence or further elucidated the inferences that could be drawn from it. Most jurors would understand that occupying a motel room places a person in temporary possession of that premises.[5] This is consistent with a lay understanding of "trespass" and consistent with the language of Count 1 of the indictment that the motel room at the Royal Inn Motel was an "occupied structure that is the permanent or temporary habitation of another * * * in which at the time * * * Jennifer Nunez-Tercero and/or Antonio Paredes * * * was present." (Indictment, 2-3.) By this or any commonly held understanding of "trespass," the jury was able to find without further instruction that Thompson, at White's direction, trespassed in Nunez' motel room by using false pretenses to deceive her. We have already found that the evidence was both sufficient and weighty to find that White was guilty of burglary through complicity with what he asked Thompson to do and which she did do. We find no prejudice to White for failure to instruct the jury on the meaning of the word "trespass."

{¶ 59} " 'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). It is hard to fathom why the outcome of this trial might have been affected if the jury had been instructed with this definition. A gunshot wound to the arm as was described by the responding police officer qualifies as physical harm under any reasonable definition of the phrase, and especially to the sensibility of any reasonable juror. White alludes to the

---

[5] Civil law generally discusses trespass and possession in this way: "Implicit in an action in trespass is the notion that plaintiff was either actually or constructively in possession." *Craig Wrecking Co. v. S. G. Loewendick & Sons, Inc.*, 38 Ohio App.3d 79, 80, 321 (10th Dist.1987), cited with approval by *Abraham v. BP Exploration & Oil*, 149 Ohio App.3d 471, 2002-Ohio-4392, ¶ 15 (10th Dist.)

notion that the jury may have been confused between "serious physical harm" and "physical harm" since only "serious physical harm" had been defined, and felonious assault contains optional elements involving both types of harm. However, if the jury confused "physical harm" with "serious physical harm" and held the prosecution to the definition given for "serious physical harm," the failure to define "physical harm" actually worked in White's favor. That is, one possibility to convict White would have been to find that he "knowingly * * * [c]ause[d] or attempt[ed] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). And whether being shot in the arm constitutes "physical harm that involves acute pain of such duration as to result in substantial suffering" (serious physical harm) is a much closer question than whether the gunshot wound to the arm constitutes "any injury * * * regardless of its gravity or duration" (physical harm). R.C. 2901.01(A)(3); R.C. 2901.01(A)(5)(e). Thus, even if the confusion White hypothesizes had occurred, it operated to White's benefit, not to his prejudice.

{¶ 60} The Jury Instructions contain a general instruction on "cause" as follows:

> The state charges that the act or failure to act of the defendant caused (death) (physical harm to [person] [property]). Cause is an essential element of the offense. Cause is an act or failure to act which in a natural and continuous sequence directly produces the (death) (physical harm to [person] [property]), and without which it would not have occurred.

*Ohio Jury Instructions*, CR Section 417.23. While the trial court did not give this instruction, White does not explain, nor do we see why, there is any reasonable probability that the court's failure to give such an instruction caused him prejudice.

{¶ 61} While White was entitled to these instructions, they were not part of his trial's jury instructions, and the jury had to rely on its own understanding of "cause." Had White's counsel asked for them, it would be difficult to imagine a scenario in which the trial court would not have given them. However, White's counsel did not ask and did not object to the instructions that were given. Despite this, we find no reason to believe that the outcome of this case would have been affected, even had the instruction been given.

{¶ 62} We do note that, in the context of the offense of obstruction of justice, we recently found plain error for the failure to instruct on the meaning of "purpose." *State v. Woods*, 10th Dist. No. 15AP-24, 2016-Ohio-661. In *Woods*, defense counsel did not object

or specifically request an instruction on the meaning of "purpose," just as here defense counsel failed to object or request instruction on the definitions White now raises.

{¶ 63} There, as here, we recognized that the Supreme Court has instructed that "an appellate court must review the instructions as a whole and the entire record to determine whether a manifest miscarriage of justice has occurred as a result of the error in the instructions." *Woods* at ¶ 7. In *Woods*, reviewing the instructions as a whole and the entire record, we found that there was "considerable ambiguity" in the evidence before the jury about the defendant's purpose. *Woods* at ¶ 10-11. Because the evidence in that case led to a variety of inferences in determining the defendant's purpose, the failure to define the term, "purpose," did prejudice the defendant and affect the outcome. *Woods* at ¶ 10-14.[6]

{¶ 64} Here, by contrast, there is no ambiguity presented by the evidence that anyone other than White possessed a gun during the incident. Thus, the inferences that can be made on this evidence are limited. There is no indication in the record or even argument by White, that the failure to instruct on these terms could have resulted in multiple inferences about what caused Paredes' injury, a gunshot wound. We find no prejudice similar to what we found in *Woods* or that would have affected the trial's outcome.

{¶ 65} Thus, we find no plain error, and White's fourth assignment of error is overruled.

### G. Fifth Assignment of Error – Whether White's Trial Counsel Provided Constitutionally Ineffective Assistance

{¶ 66} Ineffective assistance of counsel claims are assessed using the two-pronged approach set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* As the Supreme Court recently made clear in *Rogers*, the second prong of this analysis is the same as the prejudice inquiry for plain error. That is, "the accused is [] required to

---

[6] Moreover, in *Woods,* model jury instructions as contained in Jury Instructions ("OJI") included a detailed definition of "purpose" in the context of the particular offense, obstruction of justice. *Woods* at ¶ 8. No such similar specialized definition in OJI (beyond the general definition quoted) exists for "cause" in the context of felonious assault. *Ohio Jury Instructions*, CR Section 503.11(A)(Rev. Dec. 11, 2010).

No. 15AP-565

demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." *Rogers* at ¶ 22.   White posits a number of alleged miscues by trial counsel that he argues individually and collectively meet this standard.  We address each in turn.

### 3. Failure to Request a Mistrial or Seek a Continuance for Further Investigation Regarding Threats made by White Against Thompson

{¶ 67} White argues that his counsel should have sought a continuance or a mistrial to further investigate allegations of threats made by White against Thompson. However, as White's brief points out, defense counsel did request an opportunity to interview witnesses to the alleged threats, was given an opportunity to do so during the lunch hour at trial, and did, apparently, talk to Thompson and "other people involved." (Tr. Vol. II, 183.)  In fact, trial counsel's exact comments when asked if she had arguments to make regarding the threats and their effect on White's bond status were, "I really don't have a lot to say at this point.  I talked with her and other people involved, your Honor." (Tr. Vol. II, 183.)  White finds this remark to be "unclear."  However, White's counsel seems to have verified to her satisfaction that White indeed made the threats (which were believable given that the record also contains audio recordings of White telling his associate to bribe or kidnap witnesses) and therefore determined not to further investigate or argue an issue upon which there was little to no reasonable chance of success.  While White argues that the investigation by his counsel was insufficient, he does not explain why further investigation might have improved the situation.  This was not deficient performance. *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006), citing *State v. Campbell*, 69 Ohio St.3d 38, 52-53 (1994) (explaining that a strategic failure to object is not ineffective assistance even where there is a legitimate legal ground for objecting).

### 4. Whether Defense Counsel Failed to Object to Improperly Admitted Evidence

{¶ 68} Even assuming, arguendo, that the admission of evidence of other bad acts by White and evidence tending to show that White was in jail were erroneous and that counsel made a mistake in failing to object at every opportunity, we have already explained that we see no reasonable probability that White suffered prejudice such that

the outcome of the trial may have been affected. Thus, even were the first requirement of the *Strickland* test met, the second is not.

### 5. The Failure of Defense Counsel to Cross Examine White's Co-Defendant on her Motives for Testifying

{¶ 69} White argues that his trial counsel should have cross-examined his co-defendant about her motive to satisfy the prosecutor with her testimony to advance her potential for judicial release. However, before White's counsel could effectively cross-examine Thompson, the prosecutor conducted direct examination of Thompson and thoroughly brought out the terms of the plea agreement. For example, some of the exchange reads as follows:

Q. You entered into a plea agreement with me and the State of Ohio in exchange for your testimony in this case; right?

A. Correct.

* * *

Q. Now, you are serving the four-year sentence now; correct?

A. Yes, I am.

Q. Now, are you going to apply for judicial release at the 18-month mark?

A. Yes.

Q. Now, what is your understanding of my position with regard to judicial release? Did I promise you you're getting out?

A. No.

Q. Did I promise you what I'm going to say when you file for judicial release?

A. No.

Q. What is your understanding that I'm going to do for you?

A. My understanding is as long as I do what I'm supposed to do, stay out of trouble while I'm there, go to the Alvis House for six months upon my judicial release, and to help you out, if you needed me to, with my codefendant.

Q. Then I'll do what?

A. You'll consider my judicial release.

Q. Who decides judicial release?

A. The judge.

No. 15AP-565

Q. So when you file and that comes up before the judge, am I going to oppose that or support that or not going to take a position?

A. I would hope that you wouldn't oppose it.

Q. That's, in fact, what it says in this?

A. Correct.

(Tr. Vol. II, 153, 159-60.)

{¶ 70} While it was certainly within the purview of the role of White's counsel to cross-examine Thompson more aggressively on this issue, we cannot say that it was constitutionally deficient for her not to have done so.   White's counsel may have concluded that attempting to aggressively imply Thompson was lying, after her testimony had already been corroborated by other witnesses, would ruin the defense's credibility with the jury.  We do not find this to be deficient performance.

### 6. Whether Defense Counsel Erred by Asking Thompson Questions that Brought Forth Additional Evidence of Bad Acts by White

{¶ 71} White points out that during cross-examination his counsel often asked questions that elicited unfavorable answers from witnesses. While a defense strategy that includes asking Thompson what kind of drugs White gave her in exchange for her work in locating Nunez or to ask Nunez about "numerous calls" she had made to the police regarding White may not be ideal, a few potentially ill-considered questions do not create a constitutional infirmity to the right to counsel. *Strickland* at 687 (explaining that to justify the conclusion that counsel was deficient "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment").  Moreover, White does not explain how questions that essentially elicited a repeat of prejudicial testimony already obtained by the prosecution on direct, caused White additional prejudice such that there was a reasonable probability that the outcome of his trial was affected. (White's Brief, 41.) (stating that the "entire line of * * * questioning restated, without any real impeachment, many of the prejudicial statements Nunez said on direct examination"); *Rogers* at ¶ 22.

{¶ 72} White also takes issue with a line of questions asked by his counsel that elicited the fact that Nunez was staying at the motel to hide from White. However, as White admits, this line of questioning was juxtaposed with questions about whether

No. 15AP-565

Nunez felt she and her boyfriend were in danger when she let Thompson into the room and whether Nunez thought about the danger before broadcasting her location via her cell phone. In our view, this juxtaposition shows an impeachment attempt by defense counsel to illustrate that Nunez was lying about hiding from White at the motel since she took very little care otherwise to shield her location from the world and apparently gave no serious thought to the danger of letting a stranger into her motel room at two or three in the morning. This line of questioning is not evidence of deficient performance.

### 7. Whether Defense Counsel Erred in Commenting on the Fact that Neither Paredes nor White Testified

{¶ 73} White next takes issue with the fact that during closing argument defense counsel remarked that this was a strange case in that neither the victim nor the defendant testified. White interprets this as suggesting that White's silence equates to guilt. It is axiomatic that "[i]t is improper for a prosecutor to comment on a defendant's failure to testify." *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, ¶ 103, citing *Griffin v. California*, 380 U.S. 609, 615 (1965). However it is not necessarily improper or erroneous for defense counsel to make or elicit such a comment. For instance, the Seventh District Court of Appeals has reasoned:

> Testimony elicited by the defense during the state's case-in-chief cannot be construed as an improper attempt by the state to make probative use of a defendant's silence. This is not the type of comment *Leach* is designed to protect against. To hold otherwise would allow enterprising defense counsel to create reversible error by deliberately eliciting improper testimony from the state's witnesses.

*State v. Collins*, 7th Dist. No. 10 CO 10, 2011-Ohio-6365, ¶ 21, citing *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147.

{¶ 74} We agree that it was strategically dangerous to draw the jury's attention to the fact that White did not testify. However, read in the context of the rest of the paragraph (which addressed the high standard of reasonable doubt), we do not find this remark to have been prejudicial to White. Rather, this remark can be construed to have been intended to draw the jury's attention to the limited pool of evidence from which to reach any conclusion beyond a reasonable doubt. Under the circumstances, and considering the other evidence against White, we do not find this comment to have been

deficient performance in the relevant sense or that it prejudiced White such that the outcome of the trial was affected.

### 8. Whether Defense Counsel was Ineffective in Failing to Object to the Jury Instructions

{¶ 75} As already discussed, the failure of the trial court to define some elements of the offenses was not prejudicial to White. Therefore, the failure to object to their absence was not prejudicial either.

{¶ 76} In defining "serious physical harm" but not defining "physical harm" White may have reaped a benefit because it is possible the jury may have become confused and held the prosecution responsible to show "serious physical harm" where only "physical harm" needed to be proved. Failing to object to matters that may be technically incorrect but where no benefit can be gained by objecting or, as here, a benefit can be gained from staying silent, is not deficient performance. *Johnson* at ¶ 140, quoting *Lundgren* at 774, citing *Campbell* at 52-53 (explaining that a strategic failure to object is not ineffective assistance even where there is a legitimate legal ground for objecting).

### 9. Whether the Cumulative Effect of Errors by Defense Counsel Resulted in Constitutionally Ineffective Assistance

{¶ 77} Finally, White argues that, even if each of the individual errors of counsel are insufficient to rise to the level of deficient and prejudicial representation, collectively, the errors do satisfy the *Strickland* test. Assuming, arguendo, that White was to successfully argue that the deficient performance requirement of the *Strickland* test is met, White still cannot succeed on the second requirement—that there is a reasonable probability that he suffered prejudice such that the outcome was affected. *Rogers* at ¶ 22. Two witnesses who did not know each other, but who both knew White well, both identified him as the perpetrator of these offenses, and their testimony squared relatively well with the evidence the police officer collected at the scene. Both witnesses testified that White shot into the motel room, and the first police officer found a shell casing outside the motel room, a bullet hole in the motel room window, and a man inside with a bullet wound in his arm.

{¶ 78} White has not shown the required prejudice to satisfy the *Strickland* standard. We overrule his fifth assignment of error.

No. 15AP-565

## IV. CONCLUSION

{¶ 79} Because the evidence against White, even discounting the evidence addressed by White's assignments of error, was significant and weighty, we do not find a reasonable probability that any of the errors White raises were prejudicial or affected the outcome of his criminal trial. Accordingly, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN, P.J., and KLATT, J., concur.

———————————