[Cite as *State v. Carter*, 2017-Ohio-1233.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO. 1-15-62

      v.

MARKELUS Q. CARTER,               O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2014 0139

Judgment Affirmed

Date of Decision:   April 3, 2017

APPEARANCES:

    *F. Stephen Chamberlain* **for Appellant**

    *Jana E. Emerick* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, Markelus Q. Carter ("Carter"), brings this appeal from the September 22, 2015, judgment of the Allen County Common Pleas Court sentencing Carter after he was found guilty in a jury trial of Aggravated Murder with a firearm specification in violation of R.C. 2903.01(A) and R.C. 2941.145(A), and Having Weapons While Under Disability in violation of R.C. 2923.13(A)(3), a felony of the third degree. On appeal, Carter argues that there was insufficient evidence presented to convict him, that his convictions were against the manifest weight of the evidence, that the trial court erred by denying his request for a mistrial based upon an altercation that occurred in a holding cell between Carter and a State's witness, that the trial court improperly allowed evidence of the altercation to be introduced during the trial, that the State committed discovery violations, that the State committed prosecutorial misconduct in closing arguments, and that Carter received ineffective assistance of counsel.

### *Facts and Procedural History*

{¶2} On April 17, 2014, Carter was indicted for Aggravated Murder with a firearm specification in violation of R.C. 2903.01(A) and R.C. 2941.145(A) respectively, and Having Weapons While Under Disability in violation of R.C. 2923.13(A)(3), a felony of the third degree. It was alleged that Carter shot and killed Kenneth Warrington shortly after 5 a.m. on February 23, 2009. Warrington had a

relationship with Carter's ex/the mother of Carter's children, Sonya Burkholder (nka "Hughes"). Warrington was shot six times just outside of Sonya's residence in Lima, Ohio. Carter pled not guilty to the charges.

{¶3} After a lengthy pre-trial process that included, *inter alia*, multiple suppression hearings and a competency evaluation, Carter's case proceeded to a jury trial, which was held September 8-22, 2015. At trial the State presented the testimony of 30 witnesses and over 150 exhibits, then rested its case. Carter presented the testimony of 8 witnesses and in excess of 30 exhibits, then rested his case. Ultimately the jury found Carter guilty of Aggravated Murder with a firearm specification and Having Weapons While Under Disability, all as indicted.

{¶4} Carter was sentenced to life in prison without parole on the Aggravated Murder charge, a three-year consecutive prison term on the firearm specification, and a three-year concurrent prison term on the Having Weapons While Under Disability charge. A judgment entry memorializing Carter's sentence was filed September 22, 2015. It is from this judgment that Carter appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE DEFENDANT BY FAILING TO EXCLUDE EVIDENCE OF AN ALTERCATION BETWEEN THE DEFENDANT AND A GOVERNMENT WITNESS IN A HOLDING CELL OF THE COURT DURING TRIAL AND ALLOWING A VIDEO OF THAT ALTERCATION TO BE**

**PLAYED FOR THE JURY DURING THE GOVERNMENT'S CASE IN CHIEF.**

**ASSIGNMENT OF ERROR 2**
**THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE DEFENDANT BY OVERRULING DEFENDANT'S MOTION FOR MISTRIAL FILED ON SEPTEMBER 16, 2016, BASED UPON RULE 16 DISCOVERY VIOLATIONS AND BRADY DISCOVERY VIOLATIONS RELATED TO TESTIMONY OF A GOVERNMENT WITNESS ON FIREARMS.**

**ASSIGNMENT OF ERROR 3**
**THAT THE CONVICTION OF THE DEFENDANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND, IN THE ALTERNATIVE, WAS BASED UPON INSUFFICIENT EVIDENCE.**

**ASSIGNMENT OF ERROR 4**
**THAT THE PROSECUTION STATEMENTS IN CLOSING ARGUMENT MISSTATE THE EVIDENCE AND RISE TO THE LEVEL OF PROSECUTORIAL MISCONDUCT AND REQUIRE A REVERSAL.**

**ASSIGNMENT OF ERROR 5**
**THAT THE DEFENDANT WAS DEPRIVED OF A FAIR TRIAL DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL.**

**{¶5}** For ease of discussion, we elect to address the assignments of error out of the order in which they were raised.

### *Third Assignment of Error*

**{¶6}** In Carter's third assignment of error, he argues that there was insufficient evidence presented to convict him of Aggravated Murder with a firearm

specification and Having Weapons While Under Disability. Carter also argues that his convictions were against the manifest weight of the evidence.

Standard of Review

{¶7} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* When an appellate court reviews a record upon a sufficiency challenge, " 'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard,* 104 Ohio St.3d 54, 2004–Ohio–6235, ¶ 77, quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶8} By contrast, in reviewing whether the trial court's judgment was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. Furthermore, "[t]o reverse a judgment of a trial court on the weight of the evidence, when the judgment

results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required." *Thompkins* at paragraph 4 of the syllabus, citing Ohio Constitution, Article IV, Section 3(B)(3).

Relevant Statutes

{¶9} Carter was convicted of Aggravated Murder, which is codified in R.C. 2903.01(A), and reads, "No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."

{¶10} A firearm specification was attached to the Aggravated Murder, which is codified in R.C. 2941.145. It requires that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

{¶11} Carter was also convicted of Having Weapons While Under Disability for possessing the weapon he used in the murder of Kenneth Warrington. Having Weapons While Under Disability is codified in R.C. 2923.13(A)(3), and reads " * * *[N]o person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person * * * has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse[.]

Evidence Presented

*a. Testimony Regarding Events Prior to the*
*February 23, 2009 Murder*

{¶12} Carter and Sonya Burkholder had two children together, Tarah and Markelus. The children and Sonya lived with Carter until 2004 when Sonya's mother became "gravely ill," so Sonya moved in with her. After Sonya's mother died, Sonya stayed in her mother's former residence until Sonya lost the house in 2007. At that time, Sonya moved back in with Carter; however, it was not to rekindle a romantic relationship. Rather, according to Sonya the relationship was platonic and she and Carter lived more as "roommates." While staying at Carter's residence, Sonya slept in her daughter Tarah's room with her.

{¶13} Despite the fact that Sonya indicated she and Carter did not have a romantic relationship in 2007, Sonya testified that Carter was very controlling. Sonya indicated that Carter had been that way during their relationship when they were previously together, not allowing Sonya to socialize on her own. Additionally, Sonya stated that Carter did not give her a key to his home when she moved in during 2007 and that Carter had to let her in the house or she would get locked out.

{¶14} While living with Carter in late 2007, Sonya was working as a security shift supervisor for Allied Barton Security Services, which did security for the Husky Refinery in Lima. Through her job, Sonya developed a friendship with

Kenneth Warrington, who worked at the refinery. Sonya indicated that she did not tell Carter about her friendship with Warrington.

{¶15} On December 15-16, 2007, Sonya and Warrington exchanged flirtatious emails, which were included in the record at trial. Sonya testified that Carter was good with computers and got into her email and found her exchanges with Warrington. The day after the email exchange, December 17, 2007, Sonya worked second shift at her security job and returned to Carter's home, showered and went to bed in Tarah's room. According to Sonya, Carter woke her up that night, extremely angry, and told her to pack her bags and get out.[1]

{¶16} Sonya stated that Carter had a gun in his hand, that he followed her down the stairs, and that Carter struck her across the jaw with the gun.[2] Sonya stated that she went outside and flagged down a police officer who happened to be in the area and told the officer what happened. The officer then approached Carter's residence but Carter would not come outside or let the officers see the children. As a result of being informed that Carter had a gun, that children were inside, and that police were refused access to check on the safety of the children, more officers were called to the scene.

---

[1] It was insinuated that it was at this point Carter found the emails between Sonya and Warrington.
[2] Tarah's testimony differed as to this incident, stating that Carter never struck Sonya with a gun. There was also conflicting testimony as to whether Sonya had some actual injury on her face from any purported strike.

{¶17} A four-hour "stand-off" then ensued wherein Carter had multiple phone conversations with a police hostage negotiator. On the calls, some of which were recorded and played for the jury, Carter denied that his children were being held hostage, but he would not come outside and would not let the police see the children. On the calls Carter talked about honor and dishonor and how an honorable person should not have to go to jail. Meanwhile, the police attempted to keep him calm. Eventually the situation ended peacefully and Carter was taken into custody. Although an "air gun" was found inside Carter's home, no actual firearm was located at that time. No charges were brought against Carter as a result of the "stand-off" incident.

{¶18} After the December 2007 incident, Sonya moved out of Carter's residence and moved in with friends Krista and Don Bodiker, who also worked security at the refinery. Sonya stayed with the Bodikers until late-summer/early fall of 2008 when she moved into a house at 436 McKibben Street in Lima.

{¶19} While living with the Bodikers, Sonya sought and received a civil protection order ("CPO") against Carter based primarily on the "stand-off" incident. Carter contested the CPO and appealed the granting of that CPO to this Court. We

affirmed the CPO in *Burkholder v. Carter*, 3d Dist. Allen No. 1-08-20, 2008-Ohio-4644.[3]

{¶20} Meanwhile, after he was not charged as a result of the December 2007 "stand-off" incident, Carter was in contact with the Lima Police Department seeking to have Sonya charged for filing a false report or making false claims regarding the incident. That case was eventually assigned to a detective, though the detective testified that it was low priority and he did not look into it for a while.

{¶21} During 2008, Sonya and Warrington's relationship deepened and according to Sonya the relationship became sexual for about two weeks in the summer of 2008. When Sonya moved out of the Bodikers' residence and into her own house on McKibben Street around August of 2008, Warrington occasionally stayed at the residence.

{¶22} Throughout Warrington's relationship with Sonya, Warrington was married to Faye Warrington. Warrington and Faye had been married since 1983. Faye testified that Warrington told her about his relationship with Sonya when it began. Faye testified that despite the affair she did not want a divorce because Warrington still brought his paycheck home and Faye was hopeful that they would reconcile. Warrington did eventually move out of the marital residence though, and

---

[3] In our 2008 opinion, the last name of Krista and Don Bodiker was spelled "Boedeker," likely due to what the court reporter typed in the corresponding transcripts. Krista and Don spelled their last name for the record in this transcript.

it was Faye's understanding that Warrington stayed either at his uncle's residence or at Sonya's residence.

{¶23} Faye testified that she did not tell her family about Warrington's infidelity, choosing instead to speak with her minister about it. Faye indicated that she did not want others to change their opinion of Warrington. However, Faye testified that her family found out about Warrington's affair because they had received anonymous letters informing them of the situation. Faye testified that she did not know who wrote the letters, but she had received phone calls from Carter informing her of the relationship between Warrington and Sonya, which Faye already knew about.

{¶24} Faye testified that Carter called her many times, sometimes at two or three in the morning stating that Warrington's truck was at Sonya's residence.[4] Faye testified that on one of the calls in the weeks prior to Warrington's death in February of 2009, Carter stated that he was going to give Warrington "one more chance" and that Carter stated he was going to call Warrington and tell him to stay away from Sonya. (Trial Tr. at 339). Faye asked whether Carter was threatening Warrington and she testified that Carter did not respond.

{¶25} Similarly, the Husky Refinery received a call that was linked to Carter in early January of 2009. A man identifying himself as "Mark Carter" called the

---

[4] Her specific words were, "after that, I can't even tell you how many phone calls I got from him." (Trial Tr. at 338).

refinery requesting company policies regarding the use of property for employees engaged in an extramarital affair, specifically Sonya and Warrington. Pam Callahan answered the call for Husky and she stated that although the caller stated that he needed the information for a lawsuit and he sounded professional, she did not believe it was legitimate.

{¶26} On February 18, 2009, the detective who had looked into Carter's claims that Sonya should be charged for making a false report regarding the 2007 "stand-off" incident informed Carter that he had looked into the matter and he recommended that no charges be filed against Sonya. The detective informed Carter that he turned the case over to the city prosecutor's office, which agreed with him. The detective indicated Carter was not happy with the results.

*b. Testimony Regarding the Murder and its Investigation*

{¶27} On February 22, 2009, Sonya saw Warrington at work and Warrington indicated that he needed a key to her residence because Sonya had mistakenly taken Warrington's off of the counter and he did not have his key at the time. It seems that at that time the two worked different shifts that overlapped at the end of Sonya's and the beginning of Warrington's. According to Sonya, the two were not romantically involved at the time but Warrington still stayed at her residence

occasionally and he kept some work uniforms in her son's room.[5] Sonya testified that when she gave Warrington her key it was the last time she saw Warrington alive.

{¶28} Sonya testified that she left work and went to pick up Tarah at Carter's residence. Sonya indicated that Tarah had sent Sonya a text message earlier asking if Warrington was coming over to Sonya's that night and Sonya found it odd. Sonya testified that she asked Tarah about the text message but Tarah did not know anything about it. Sonya then returned with Tarah to her home at 436 McKibben and went to sleep.

{¶29} Work records established that Warrington clocked out of the refinery at 5:04 a.m. on February 23, 2009. Sometime shortly thereafter, Warrington was shot six times just outside a side entrance of Sonya's home.

{¶30} Donald Hovest, who was picking up trash on his route on a street close to 436 McKibben, heard the gunshots in his general area. He indicated that the gunshots occurred after 5 a.m., sometime possibly around 5:20. He reported the gunshots to police, which dispatched officers related to possible gunshots in the area at 5:18 a.m. Police responded to the area but officers did not observe anything relevant at that time.

---

[5] The extent of Sonya and Kenneth's relationship at the time of Kenneth's death was a source of some dispute. When making a later 9-1-1 call Tarah referred to Kenneth as his mother's boyfriend. Sonya maintained that the two were good friends at the time of his death but no longer romantically involved.

{¶31} Rosalind Johnson was asleep on her couch across the street from 436 McKibben and was awakened by the noise from the gunshots. She looked out her window and saw a person coming out of the alley with a "hoodie jacket on, a camouflage jacket." (Trial Tr. at 819). However, Johnson did not see any actual shooting and she simply went back to sleep.

{¶32} Sonya woke up at 6 a.m. on February 23, 2009, and noticed that Warrington's truck was parked at her residence but he had not come inside. After waking up Tarah and mentioning that it was odd, Sonya discovered Warrington's body just outside and screamed. Tarah called 9-1-1 after checking Warrington for a pulse. The 9-1-1 call was played for the jury.

{¶33} Police responded to the scene and began an investigation. It was ultimately determined that Warrington's death was a homicide resulting from six gunshot wounds. The shots were to his chin, right forearm, left chest, right buttock and two in the back. There were 12 holes total because all six bullets exited Warrington's body. The investigation further revealed that Warrington was shot by Winchester 9mm bullets. Shell casings and bullets were collected at the scene. Warrington was discovered with $160 on him, which officers felt ruled out a robbery, along with a gym bag and a cooler. Photographs of how and where Warrington was found just outside Sonya's door were included in the record.[6]

---

[6] The jury also took a jury view of what was Sonya's residence at the time.

{¶34} While at Sonya's residence surveying the scene, one officer noticed that there was an electric bill for Carter on the counter and the officer recalled the 2007 "stand-off" incident.[7] Officers then wanted to get into contact with Carter. The detective that handled Carter's allegations against Sonya for filing a false report, Sergeant Godfrey, indicated that he had Carter's phone number so he called Carter around 8 a.m. and generally asked Carter to come into the station. When Carter answered, Carter asked if Sergeant Godfrey was calling because there had been some movement on his case with Sonya. At that time Carter was told to just come in without any further information being provided to him and Carter said he would be in shortly.

{¶35} A half-hour passed and Carter had not come in, so Sergeant Godfrey called Carter again and said something had happened to "Kenneth" and Carter needed to come in. Carter stated that he did not like the sound of that but would come to the police station as soon as he finished a work-related errand.[8]

{¶36} Before Carter came to the police station, Carter called his attorney Ken Rexford's office to ask if something had happened to him since Carter was informed that something had happened to "Kenneth." Leah Rexford, the attorney's wife who

---

[7] It appears that Tarah was using the electric bill to show proof of residence for a school-related issue. It was not insinuated that Carter himself had left the electric bill or that he had brought it there himself.

[8] Carter stated that he had to drop off some "proofs" to an insurance agent before he would come into the station. When Carter was later stopped, he did have the referenced "proofs" on him. However, officers spoke with the insurance agent who indicated that he had requested the proofs so long ago from Carter that he was not specifically expecting them that day.

-15-

also worked at the law firm, informed Carter that nothing had happened to Carter's attorney Ken Rexford. Carter made another call to Rexford's office shortly thereafter where Carter was "inconsolable" and talking about something happening to his baby.

{¶37} As Carter drove around to apparently complete his errands that morning, he was being followed by Detective Timothy Clark who was not in a marked cruiser. Detective Clark noticed that Carter's license plates did not match and he called for a marked cruiser to stop Carter. A patrol officer then did stop Carter and Detective Clark approached and told Carter that he wanted Carter to come in for questioning. According to one officer, Carter then "exploded in emotion," as he kept talking about his baby, meaning his daughter Tarah. Officers were surprised by Carter's demeanor and assured Carter that Tarah was fine but Carter kept referring to her.[9] After being repeatedly assured that his daughter was fine, Carter then voluntarily went to the police station for an interview.

{¶38} During Carter's interview, he stated that the night prior to Warrington's murder Sonya picked up Tarah sometime after 10 p.m. and took Tarah to Sonya's residence. Carter stated that he went to bed after watching shows on his computer and then woke up at 6 a.m. to his alarm clock. Also during the interview, Carter admitted to owning a .357 but denied owning a 9mm at that time. Carter told

---

[9] A video of the stop was introduced into evidence. In the video, Carter wails repeatedly as he says something happened to his "baby," despite being told by officers that nothing had happened to Tarah.

the police that they could have his .357 and he allowed the police to do a gunshot residue test on his hands.

**{¶39}** Carter was under a disability for a prior conviction[10] and could not own a firearm, so the police indicated they were going to search his house to get the .357. A search warrant was then obtained and executed on Carter's residence to look specifically for weapons. Two guns were located at Carter's residence at that time along with a box of Winchester 9mm ammunition with some of the bullets missing. Testing later indicated that the bullets were consistent with those that killed Warrington, although they were relatively common bullets. However, testing indicated that neither of the firearms that were found at Carter's residence were used in the murder. Similarly, neither of those firearms were the subject of the Having Weapons While Under Disability charge in this case. Rather, the murder weapon, which was never found, was the firearm related to the charge.

**{¶40}** As the investigation continued on the day of the murder, a second search warrant was executed on Carter's residence looking for anything related to a homicide. On Carter's kitchen table, a number of papers were found together including a copy of the private emails between Warrington and Sonya from December of 2007, a copy of the CPO Sonya had obtained against Carter, and a

---

[10] The prior conviction is essentially undisputed on appeal but a certified copy of a judgment entry indicating that Carter had been found guilty of two fourth degree drug-related felonies in 1995 was entered into evidence. (State's Ex. 99).

copy of the related police report from the December 2007 incident. There was also a document officers described as a "script" that appeared to correspond to the phone call that had been made to the Husky Refinery in January related to Sonya and Warrington's affair.

{¶41} In addition to this paperwork, officers located camouflage clothing, which was later tested for gunshot residue ("GSR"). A short sleeve camouflage shirt and a long sleeve camouflage shirt both tested positive for GSR despite Carter stating in his interview that he had not fired a gun in years. Rosalind Johnson indicated that the camouflage pattern was consistent with what she had seen from her window on the morning of the murder. However, neither of the camouflage shirts contained a hood, which she had mentioned seeing. Nevertheless, officers also located a pair of gloves on a table and the gloves tested positive for GSR as well.

{¶42} Various electronics belonging to Carter were seized during the search and analyzed. On one of Carter's digital cameras, there were images of streets in Lima and a picture of Warrington's truck parked outside of Sonya's home at 436 McKibben dated January 9, 2009. A forensic search of Carter's computer revealed he had been on the county auditor's website for information on the property at 436 McKibben and that he had been looking at a map of the surrounding area. In addition, there were google searches performed for Sonya Burkholder and Kenneth

Warrington. A separate "palm" device also contained an address for Kenneth and Faye Warrington as well as a phone number, which had a *67 designation by it indicating that the number had been used while dialing *67 to block the caller ID.

{¶43} On the day of the murder Carter was arrested for Having Weapons While Under Disability, which is separate from the same charge in this case. When Carter was taken into custody, he requested to speak with Sergeant Godfrey for a second time that day. Another interview of Carter was then conducted, and that interview was played for the jury. In the interview, Carter had some kind of 'tic,' or seizure-like occurrence that the officers did not believe was genuine. Little of relevance came out of the interview.

{¶44} While Carter was incarcerated for Having Weapons While Under Disability, Joey Moore, another inmate, stated that he heard Carter discussing the murder investigation. Moore testified at trial that Carter said that police found 16 grams of crack at his residence but they did not find a Mac-10 firearm that Carter claimed to have disassembled. A ballistics expert from BCI testified that a "Mac-10 style" firearm would be one of over 130 possible 9mm firearms that could have been consistent with the firearm that fired the bullets that killed Warrington.[11] Joey Moore also testified that Carter indicated that he had killed his girlfriend's

---

[11] The State's ballistic expert testified that the "Mac" in Mac-10 is an abbreviation for "Military Armament Corporation" and the 10 stands for model 10. The ballistic expert testified that multiple manufacturers made a firearm similar to the Mac-10, though they were not actual "Mac-10's," which were produced by a specific manufacturer.

boyfriend.[12]   Police found Moore's statement credible because he was fairly accurate in the amount of crack that was found at Carter's residence and it was not something Moore could have known otherwise.

{¶45} Also while Carter was incarcerated, he contacted a friend named Carlotta Williams and requested that she visit him. When she did, Carlotta testified that Carter held up a note asking her to tell the police that she was with him from 1:00 a.m. to 6:00 a.m. on the day of the murder. Carlotta refused and stated that the alibi Carter was requesting her to provide was false. She also stated at trial that she had seen Carter with a gun resembling a Mac-10 before when she was shown a generic demonstrative picture of a Mac-10 style firearm, though she said she had little familiarity with firearms.

{¶46} Stephen Upham, another inmate who was incarcerated with Carter, testified that Carter told him about the murder. Upham testified that Carter indicated that he had gotten into an argument with the mother of his children and her boyfriend got mad and threatened Carter's children. Carter told Upham that a couple of weeks after this incident Carter shot the boyfriend. Upham testified that Carter indicated he watched the victim for a couple of weeks coming and going and that he was wearing camouflage and a paintball mask when he committed the murder.

---

[12] Moore's testimony is slightly confusing on this issue as he initially states that Carter told him that he "smoked the bitch" referring to Carter's girlfriend, but Moore then clarifies when prompted that he meant that Carter indicated he smoked the boyfriend of his girlfriend.

{¶47} Notably just before Upham testified, he was mistakenly placed in the same holding cell with Carter during a brief recess in the trial. Upham asked Carter how his trial was going, and stood up, then Carter assaulted Upham. A video of this incident was introduced into evidence.[13]

*Sufficiency of the Evidence*

{¶48} At the conclusion of the State's case, which consisted of 30 witnesses and over 150 exhibits, Carter made a Crim.R. 29 motion for acquittal. Carter's motion was overruled by the trial court. Carter now contends on appeal that the State presented insufficient evidence to convict him of Aggravated Murder, the accompanying firearm specification, and Having Weapons While Under Disability.

{¶49} Although Carter claims that there was insufficient evidence to convict him his actual arguments related to his convictions seem to be that his convictions were against the manifest weight of the evidence because he contends that the State's testimony was not credible and that Sonya was more likely to be the killer than Carter. These arguments go to weight of the evidence rather than sufficiency.

{¶50} Nevertheless, to the extent that Carter is arguing that there was insufficient evidence presented to convict him, we do not find Carter's arguments well-taken as the State produced ample evidence to establish each element of Aggravated Murder, the accompanying firearm specification, and Having Weapons

---

[13] Whether this incident and the evidence related to it were admissible is the subject of a separate assignment of error, which will be discussed *infra*.

While Under Disability. In fact, the State presented substantial circumstantial evidence against Carter. Notably, the Supreme Court of Ohio has stated that, "direct evidence of a fact is not required, and circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson*, 57 Ohio St.3d 29, 38 (1991).

{¶51} In this case the State clearly established evidence of a motive and it also clearly established a plan for Carter to murder Warrington based on Carter's statements to Faye, the pictures Carter took essentially casing the area around Sonya's residence, and the searches Carter did on his computer. Warrington was shot six times just as he was returning to Sonya's from work, indicating that the murder was not an accident and that the killer had been waiting for him to return and aware of his schedule, which is essentially what Carter told Upham.

{¶52} The State also presented evidence of a witness who saw someone near the scene at the time of the gunshots wearing camouflage and Carter was found in possession of camouflage clothing and gloves that had GSR on them. Corroborative of this evidence was the fact that Carter told Upham that Carter had committed a murder while wearing camouflage and a paintball mask.[14] Further, Carter possessed bullets of the same type and caliber that were used to kill Warrington.

---

[14] Carter was known to play paintball and a picture of Carter wearing a paintball mask on the top of his head was introduced into evidence.

{¶53} Moreover, multiple jailhouse witnesses testified that Carter admitted to killing someone and Carter also sought out a friend to manufacture an alibi. Additionally, on the day of the murder officers remarked on the repeatedly odd behavior of Carter during the traffic stop and during his interviews, much of which was viewed by the jury.

{¶54} Based on all of this we conclude that sufficient evidence was presented to find that Carter committed Aggravated Murder and did so with a gun, which would make him guilty of the accompanying firearm specification and Having Weapons While Under Disability as well.

*Manifest Weight of the Evidence*

{¶55} Turning to Carter's argument that his convictions were against the manifest weight of the evidence, we must review all of the evidence presented, which includes the evidence presented by Carter.  Carter called several witnesses on his behalf who were inmates with the inmates who testified against Carter.  The inmates testifying on Carter's behalf casted doubt on the credibility of the State's inmate-witnesses, particularly Upham.

{¶56} Carter also emphasized that sometime after the "stand-off" incident, Sonya got a concealed-carry license.  In addition, Carter called a witness who testified that prior to Warrington's death a sign had been put on Warrington's license

plate that said "Number One Asshole." Sonya previously testified that she put that sign on Warrington's truck in jest, as Warrington was a practical joker.

{¶57} In his case-in-chief, Carter also called a fingerprint expert from BCI who testified that none of the prints taken from Warrington's truck were consistent with Carter's prints. Finally, Carter called his daughter, Tarah, who testified that Carter did not strike Sonya with a gun during the 2007 "stand-off" incident, contrary to what Sonya had testified. Tarah also testified that Warrington was not at Sonya's residence every night; however, Tarah testified, contrary to Sonya, that Sonya indicated she was waiting on Warrington to get a divorce, and that Warrington had indicated to Sonya that it was imminent. Finally, Tarah testified that the night before the murder Sonya was "acting different," and that she was drunk, which Tarah had never seen.

{¶58} On appeal, Carter contends that the evidence actually established that Sonya was the more likely suspect or, at the very least, the evidence created reasonable doubt as to whether Carter killed Warrington. Despite Carter's arguments, officers testified that Sonya was investigated and that she was ruled-out as a suspect. In addition, Sonya testified that she took the concealed-carry course with a number of people at work who were doing the course but she never actually purchased a gun. The jurors were also able to see and hear Sonya's testimony, as

well as any contrary testimony of her daughter Tarah, and evaluate their credibility for themselves.

**{¶59}** Notwithstanding Sonya, Carter ignores the overwhelming circumstantial evidence establishing him as the culprit of the Warrington murder, which was discussed previously. After a thorough review of the record, the transcripts, and the exhibits presented we cannot find that the jury clearly lost its way and created a manifest miscarriage of justice. Therefore, we find that Carter's arguments are not well-taken and his third assignment of error is overruled.

### *First Assignment of Error*

**{¶60}** In Carter's first assignment of error, he argues that the trial court erred by failing to declare a mistrial after there was an altercation between Carter and one of the State's inmate-witnesses, which occurred in a holding cell during a recess on the seventh day of trial. In addition, Carter argues that the trial court erred by permitting evidence of the altercation to be presented to the jury, claiming that it was improper under Evid.R. 403 and Evid.R. 404(B).

### Standard of Review

**{¶61}** The grant or denial of a motion for a mistrial rests within the sound discretion of the trial court. *State v. Garner*, 74 Ohio St.3d 49, 59 (1995). Thus the trial court's decision is to be given great deference. *State v. Hines*, 3d Dist. Marion No. 9-15-13, 2005-Ohio-6696, ¶ 23. Notably, mistrials are appropriate only when

the ends of justice so require and a fair trial is no longer possible. *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). Because the decision to grant or deny a motion for mistrial rests within the sound discretion of the court, we will apply an abuse of discretion standard in reviewing the issue. An abuse of discretion constitutes a decision that is arbitrary, capricious, or grossly unsound. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶62}** Similarly, as to the evidentiary issues raised by Carter, we review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *State v. Cassel*, 2d Dist. Montgomery No. 26708, 2016-Ohio-3479, ¶ 13, citing *State v. Graham,* 58 Ohio St.2d 350 (1979), and *State v. Morris,* 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 19.

Relevant Rules of Evidence

**{¶63}** Carter contends that Evidence Rules 403 and 404(B) should have precluded presentation of the altercation between Carter and Upham at trial. Evidence Rule 403(A) reads as follows.

> **(A) Exclusion Mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.**

Evidence Rule 404(B) reads,

> **(B) Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may,**

**however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.**

The Altercation, the Mistrial Motion, and the
Introduction of Evidence of the Altercation

{¶64} On the seventh day of Carter's trial, Steven Upham, an inmate who had previously been incarcerated with Carter, was set to testify against Carter. Upham was the inmate who Carter had told that Carter killed a man while wearing camouflage and a paintball mask.

{¶65} Just prior to Upham testifying, Upham was placed in a holding cell. When the trial court took a brief afternoon recess, Carter was taken and placed in the same holding cell with Upham.[15] No one else was present in the holding cell at that time. It is undisputed that neither Carter nor Upham said anything to the corrections officers questioning why they were placed in the same holding cell or alerting the officers to the situation.

{¶66} Upham was seated when Carter entered the holding cell. According to Upham, who was surprised that they were placed in the same cell, Upham said to Carter, "How's your trial going?" (Trial Tr. at 1396). Carter then responded by

---

[15] Just after the incident both parties stated that they believed the incident was entirely accidental. (Trial Tr. at 1362).

saying, "Why are you lying on me?" (*Id*. at 1397). At that time, Upham stood up and Carter then approached and assaulted Upham by throwing a punch. Next, Upham tried to put Carter in a headlock and Carter put his finger in Upham's eye. Carter also bit Upham's arm, leaving teeth marks. After roughly forty seconds, officers responded and broke up the altercation. The incident was recorded by surveillance video but there was no accompanying sound. Upham had several abrasions from the altercation, which were photographed.

{¶67} Following the altercation, the trial court recessed the trial for the day. When court reconvened the following morning defense counsel moved to have evidence of the incident excluded contending that it was improper character evidence. In the event that the evidence was not excluded, defense counsel argued that the trial court should declare a mistrial. The State strongly opposed a mistrial and argued that the evidence should be admissible as showing a "consciousness of guilt."

{¶68} The trial court permitted both parties to make arguments in support of their positions. Defense counsel argued that placing Carter and Upham in the holding cell together was a complete accident and that the incident itself was not created by Carter. Defense counsel argued that evidence of the incident would be highly prejudicial and it would constitute improper "other acts" evidence under Evid.R. 404(B). Further, defense counsel argued that if Upham was to testify

defense counsel would be seeking a mistrial due to visible marks that may be on Upham from the incident, which could further prejudice Carter. Moreover, defense counsel was concerned that the jury may have heard about the incident because it had been covered in the newspaper.

{¶69} By contrast, the State argued that while Carter and Upham should not have been placed in the same holding cell together, the ultimate assault was an intentional act perpetrated by Carter and that he should not be granted a mistrial on the basis of his own actions in assaulting a State's witness. As to the admissibility of the evidence, the State argued that Carter's actions reflected "consciousness of guilt" as Carter was aware of what Upham's testimony was likely to be, particularly since a number of Carter's witnesses were inmates seeking to discredit Upham.

{¶70} After allowing the parties to make their arguments, the court addressed both the motion for mistrial and the ability of the State to present evidence of the altercation. The court began with Carter's motion for mistrial because, "obviously if I grant the mistrial then everything else is, I suppose, moot[.]" (Trial Tr. at 1366).

{¶71} The trial court then analyzed the issue on the record, citing a number of cases to support its decision. First, the trial court noted that a mistrial only needed to be declared when a fair trial was no longer possible and that a mistrial should not be ordered merely because some error or irregularity had intervened. *State v. Franklin*, 62 Ohio St.3d 118, 127-128 (1991). Then, the trial court cited the invited

error doctrine, wherein a party could not take advantage of an error that the party induced, and indicated that the invited error doctrine had been applied to motions for a mistrial where the defendant had been disruptive. The trial court cited a number of cases to support its point. *See State v. Greathouse*, 2d Dist. Montgomery No. 21536, 2007-Ohio-2136 (defendant's own disruptive actions in the courtroom could not be grounds for a mistrial); *State v. Chambers*, 10th Dist. No. 99AP-1308, 2000 WL 963890 *5 ("In the present case, appellant cannot participate in numerous, intentional, disruptive acts and then seek the protection of the court from his own misbehavior."); *State v. Gonzalez*, 4th Dist. Athens No. 97CA52, 1998 WL 823737 (invited error doctrine precluded defendant from taking advantage of any prejudice that resulted from his own disruptive behavior in courtroom); *State v. James*, 2d Dist. Clark No. 98-CA-54, 1999 WL 76815 *4 (defendant could not take advantage of his own outburst because it would "provide a criminal defendant with a convenient device for provoking a mistrial whenever he chose to do so.").

{¶72} After citing these cases, among others, for their overriding principles, the trial court came to the following conclusion regarding the motion for a mistrial.

> **Now, I agree with the defense characterization, and based upon all of the information that I have that's been presented that's on the record, it was an accident. It was an unfortunate accident that the defendant and the witness were put in the same holding room. But, what occurred thereafter I find was not an accident. It was intentional based upon the viewing of the video of that. I'm going to find that the defendant cannot participate in an intentional act.**

-30-

> **So, I'm going to overrule the Motion for a Mistrial under the invited error doctrine.**

(Trial Tr. at 1368-69).

**{¶73}** Next, the trial court turned to whether evidence of the altercation could be presented at trial. The trial court determined that Evid.R. 404(B) was not implicated in situations where the act is related to the crime or has a connection to the offense. *See State v. Goehring*, 6th Dist. No. OT-06-023 2007-Ohio-5886, ¶ 15, quoting *State v. Lowe*, 69 Ohio St.3d 527, 531 (1994) ("Evid.R. 404(B) allows the admission of 'other acts' evidence if it is 'related to and share[s] common features with the crime in question * * *.' "). To support its position, the trial court cited, *inter alia*, *State v. Williams*, 8th Dist. Cuyahoga No. 89461, 2008-Ohio-1948, which stated, "Evidence of threats or intimidation of witnesses reflect a consciousness of guilt and are admissible as admission by conduct." *Williams* at ¶ 29; *see also*, *State v. Soke*, 105 Ohio App.3d 226 (8th Dist.1996).

**{¶74}** Here, the trial court found that there was a connection to the offense because Upham was going to testify that Carter had confessed a murder to him and relayed some of the details. Then the court determined that,

> **[Evid.R.] 404(B) is not implicated. This is intrinsic evidence not wholly independent of the offenses and it is evidence of an admission by conduct reflecting a consciousness of guilt that tends logically to prove an element of the crimes charged. But, even if 404(B) were implicated, which I don't think it is, but if 404(B) would be implicated it would be admissible for other purposes other than to prove character or that the defendant acted in**

-31-

> **conformity with character, such as intent, knowledge, motive, and things that are listed in 404(B).**

(Trial Tr. at 1371).

**{¶75}** Thus the trial court permitted the State to introduce evidence of the incident at trial through the testimony of Upham. Upham then testified regarding the incident, stating that Carter punched him and that Upham put Carter in a headlock in the hopes that guards would respond shortly. In addition, the State introduced the surveillance video from the holding cell, which showed the altercation. The State also introduced multiple pictures of Upham's injuries.

**{¶76}** After Upham testified, defense counsel again moved for a mistrial stating that Carter was now being charged with intimidation of a witness for Carter's actions during the altercation. Additionally, defense counsel stated his understanding that there was an investigation being done as to how Carter and Upham had been placed in the same holding cell. Defense counsel stated that he wanted that investigation to be included in the record. The court ordered that investigation to be included in the record, and the reports that were produced were included as court exhibits separate from the trial.

**{¶77}** Those court exhibits were included in the record on appeal and they contained offense reports from various officers stating what happened from their perspective, including one that concluded, "[i]t was later discovered that there was a miscommunication between jail staff and court security which lead to Dep. Enyart

placing the two inmates together in the same holding cell by mistake." (Court's Ex. 4).

{¶78} After hearing defense counsel's argument renewing his motion for a mistrial, the trial court went on to state its own view of what led to the incident, beginning with the court's recollection of an in-chambers discussion of the logistics of having the prison witnesses in the same building as Carter.

> **My understanding was that they would be separated. I double-checked my entries. \* \* \* It was the Court's understanding that that would have been generally understood. In our chamber conference there was a discussion about the prison inmates, specifically Mr. Upham, being kept in the probate holding room, which is separate from the regular holding room. I think it was in the nature of perhaps a mistake because Mr. Upham was dressed in stripes instead of in typical Department of Corrections garb that somehow there was a non-communication, or a miscommunication, to the booking officers who brought him up. So, it was an accident/mistake. I think I already mentioned that on the record. So, that's the court's take on that.**

(Trial Tr. at 1562-63).

{¶79} The court then overruled defense counsel's renewed motion for a mistrial. The court did indicate it would inquire into whether anyone on the jury had heard about the incident from the news, and the court did so. No one on the jury indicated having heard anything about the case outside of the courtroom. (*Id*. at 1374-75).

{¶80} In addition, the trial court did state that it would give a specific instruction to the jury that the incident could only be considered to show

consciousness of guilt and not to show actions in conformity with character. The

trial court did, in fact, give the jury such an instruction. It read,

> **Testimony has been admitted indicating that the defendant was involved in a physical altercation with a witness in the holding room. You are instructed that defendant's conduct alone does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness or awareness of guilt. If you find that the facts do not support that the defendant's conduct, or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find that the facts support that the defendant engaged in such conduct and if you decide that the defendant was motivated by a consciousness or an awareness of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give to this evidence.**

(Trial Tr. at 1844-45).

Carter's Arguments Related to the Motion for Mistrial on Appeal

{¶81} On appeal, Carter renews his argument that the trial court should have

granted his motion for a mistrial. Carter contends that the cases cited by the trial

court in making its decision to overrule the motion for a mistrial were

distinguishable and that the situation in this case was not of Carter's making. Carter

contends that court personnel created the situation, not Carter as the trial court

determined. Carter contends that the cases cited by the trial court were all situations

where the defendant was specifically disruptive without provocation, and most often

in front of the jury.

-34-

{¶82} In our review of the matter, we cannot condone the serious lapse that occurred by placing Carter in the same holding cell with Upham; however, we cannot find that the trial court abused its discretion in determining that the physical altercation itself was actually a direct result of Carter's own intentional action in assaulting Upham. As the trial court indicated, when Carter was paced in the holding cell he could have told the authorities that it was Upham in the cell or Carter could simply have chosen not to assault Upham when they were in the same cell. Instead, Carter chose to assault Upham, which was not an action by the State.

{¶83} Moreover, in the cases cited by the trial court, *James*, *Gonzalez*, *Greathouse*, and *Chambers*, *supra*, multiple Ohio Appellate Courts found that in situations where a defendant's actions led to his own motion for a mistrial, it was not an abuse of discretion for the trial court to overrule the defendant's motion for a mistrial, particularly under the invited error doctrine. While Carter contends that the cases cited by the court to overrule his motion for a mistrial were distinguishable, they do stand for the proposition that a defendant cannot take advantage of a situation that he created himself. It may be true that the altercation would not have been possible had Carter and Upham been kept separate as they were ordered to be, but Carter ignores that Upham never would have been struck had Carter simply ignored him upon entering the holding cell, or taken some action other than resorting to physical violence.

{¶84} In sum, while we wish to emphasize that Carter and Upham should never have been placed in the same holding cell, we cannot find that the trial court abused its discretion in declining to grant Carter a mistrial based on Carter's actions. Thus, Carter's argument is not well-taken.

Admissibility of Evidence of the Altercation

{¶85} Carter next contends that even if it was not error for the trial court to overrule his motion for a mistrial, any evidence related to the altercation should not have been presented to the jury. More specifically, Carter contends that his altercation with Upham in the holding cell in 2015 was not connected to the 2009 murder of Kenneth Warrington.

{¶86} In support of his position, Carter urges this Court to apply the dissent's rationale in a 4-3 decision by the Supreme Court of Ohio, *State v. Richey*, 64 Ohio St.3d 353, 1992-Ohio-44, *abrogated in part by State v. McGuire*, 80 Ohio St.3d 390, 1997-Ohio-335. In *Richey* the Supreme Court of Ohio determined that threats made by Richey to the prosecutor were admissible evidence as "consciousness of guilt, similar to evidence of flight to avoid prosecution, or efforts made to cover up a crime or intimidate witnesses."[16]  *Richey* at 357.

{¶87} By contrast, the dissent in *Richey*, which Carter relies upon, stated that

**A person wrongly accused could easily take out his frustration and anger in this fashion. In particular, Richey's anti-social and**

---

[16] *Richey* was reviewed under a plain error standard.

> **borderline personality traits might make the urge to lash out from a false accusation stronger. In any case, jailhouse threats are of a different order than flight from prosecution or a coverup as evidence of guilt.**
>
> **The threats made by Richey are, pure and simple, acts separate and distinct from the one for which he was being tried. Proof of such threats can be admitted during the guilt phase only to show motive, opportunity, intent, plan, and so forth. (Evid.R. 404[B].) As the threats came after the events for which Richey was being tried, none of these factors can possibly be proved by evidence of later threats. Therefore the evidence is inadmissible for the guilt phase of trial, and it was error for the trial court to admit it.**

*Richey* at 374-375.

{¶88} Carter contends that the rationale in the *Richey* dissent should be applied in this case. However, the cited portion is facially from the *Richey* dissent rather than the majority. Moreover, while a separate portion of *Richey* has been abrogated, the majority's ruling on consciousness of guilt has not been altered. *Richey's* underlying holding related to "consciousness of guilt" has, in fact, been cited even recently by multiple Ohio Appellate Courts. *State v. White*, 10th Dist. Franklin No.15AP-565, 2016-Ohio-1405; *State v. Tucker*, 10th Dist. Franklin Nos. 15AP-434, 15AP-435, 2016-Ohio-1033, ¶ 17; *State v. Culegrove*, 8th Dist. Cuyahoga No. 102173, 2015-Ohio-3476, ¶ 20, citing *State v. Soke*, 105 Ohio App.3d 226, 250 (8th Dist.1995) ("Intimidation of a witness is not independent of the charged offense; it is an indicator of guilt."). This court has also used similar reasoning to *Richey* recently, although we did not directly cite *Richey*. *State v.*

*Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ("Moreover, '[u]nder Ohio law, 'evidence of threats or intimidation of witnesses reflects a consciousness of guilt and is admissible as admission by conduct.' ").

{¶89} Carter thus urges this Court to essentially disavow a majority decision from the Supreme Court of Ohio and ignore decisions from various districts, including a prior opinion from this Court, indicating that threats against a witness can be used to show consciousness of guilt. Until this Court is given guidance otherwise from the Supreme Court of Ohio, we are bound to follow the majority opinion in *Richey*, and we are persuaded by the precedent of this Court and the other appellate courts. In these circumstances, we cannot find that the trial court abused its discretion in finding that Carter's actions could be reflective of a consciousness of guilt and thus were admissible at trial.

{¶90} Although Carter next contends that evidence of the altercation would not be admissible under Evid.R. 404(B) if it was not admissible as "consciousness of guilt," we need not address this issue having found that it was not an abuse of discretion for the trial court to find that the evidence was admissible as consciousness of guilt. However, Carter does contend that even if this Court did find that the evidence was somehow relevant and admissible, its probative value was still substantially outweighed by the danger of unfair prejudice and it should have been excluded under Evid.R. 403.

{¶91} After reviewing the record and the arguments, we cannot find Carter's argument well-taken. Undoubtedly there is some inherent prejudice in evidence being used against Carter but there is probative value in the altercation as well. We cannot find that the trial court abused its discretion in determining that the probative value was not substantially outweighed by the danger of unfair prejudice, particularly given the deference accorded to trial courts in evidentiary matters. Therefore, Carter's first assignment of error is overruled.

### *Second Assignment of Error*

{¶92} In Carter's second assignment of error, he argues that the trial court erred by failing to grant a mistrial based upon what he claims are discovery violations committed by the State. Carter argues that the State failed to disclose information that was testified to by its ballistic expert and that Carter was prejudiced by it. Carter also argues that the State failed to disclose a demonstrative picture of a Mac-10 style firearm to the defense.

### Standard of Review

{¶93} As stated previously, the decision to grant a mistrial is within the sound discretion of the trial court. *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 92. Regarding the alleged discovery violations, we will also review the trial court's decision under an abuse of discretion standard. *See State v. Opp*, 3d Dist. Seneca No. 13-13-33 2014-Ohio-1138, ¶¶ 7-15.

Case No. 1-15-62

Criminal Rule 16(K)

**{¶94}** In this assignment of error, Carter contends that the State violated

Crim.R. 16(K), which reads,

> **(K) Expert Witnesses; Reports. An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.**

The Alleged Discovery Violation, Mistrial
Motion, and Ruling by the Trial Court

**{¶95}** On the sixth day of Carter's trial, the State called Kevin Kramer, a

forensic scientist with the Ohio Bureau of Criminal Identification and Investigation

to testify. Kramer was qualified as an expert in "forensic firearm ballistic bullet and

casing analysis" with no objection by the defense.

**{¶96}** Kramer then testified that he "re-worked" or re-analyzed the ballistic

evidence in this case. The ballistic evidence had been analyzed twice previously.

The first person to analyze the ballistic evidence for the State, Todd Wharton, had

taken a new job in Florida and the second person to analyze the evidence, Heather

Williams, was on a leave of absence due to a medical issue so Kramer was asked to

analyze the evidence and testify at trial. Kramer testified that he did not review the

-40-

prior reports before doing his own analysis and that he actually did not even have access to notes or findings from the prior testing until he got his own results.

**{¶97}** Kramer testified that as a result of his examination he determined that the casings found at the scene of the Warrington murder were fired from the same firearm and that they were 9mm Luger cartridges. In addition, Kramer testified that the box of Winchester ammo—which had been located in Carter's residence—contained bullets consistent with the bullets presented by the State for him to test, although they were relatively common bullets. However, Kramer concluded that the bullets at the scene of the murder were not fired by the weapons submitted to him that were found during the search of Carter's residence.

**{¶98}** Kramer's report reflected his findings and was entered into evidence. It read, in pertinent part, "Examination of the three (3) fired bullets * * * revealed they are consistent with 9mm Luger full metal jacketed bullets fired from a conventional rifled barrel having (6) lands and six (6) grooves, right-hand twist." (State's Ex. 138). Kramer's findings were consistent with the findings of the two prior analysts.

**{¶99}** After testifying to his analysis, Kramer was asked whether he was familiar with a firearm referred to as a Mac-10 and he answered in the affirmative. As Kramer was being shown a demonstrative exhibit of a generic picture of a Mac-10 style firearm, defense counsel asked to approach the bench. Defense Counsel

objected to the photo and the questioning, stating that the picture was not provided in discovery and that he was not prepared to cross-examine Kramer relative to a Mac-10 because there was nothing in Kramer's report regarding a Mac-10.

{¶100} The State argued that it had already shown the demonstrative picture of a Mac-10 style firearm to Carlotta Williams, who previously testified in the trial, that defense counsel did not object at that time, and that Kramer was an expert in firearms and could therefore testify regarding his familiarity with a Mac-10. The State also argued that the defense was put on notice of possible inquiry into a Mac-10 due to the statements of Joey Moore. Carter had made statements that were overheard by Moore, including that when the police searched Carter's residence the police did not find a disassembled Mac-10. Ultimately the trial court overruled defense counsel's objection and allowed the State to ask questions regarding a Mac-10.

{¶101} The questioning of Kramer then resumed. Kramer testified that the demonstrative picture produced by the State in Exhibit 139 was "consistent in style and appearance with what's been described as a Mac-10 style of firearm." (Trial Tr. at 1176). Next, Kramer described a Mac-10's appearance and how it operated. Kramer was then asked if back in 2009 there was any kind of Mac-10 that could have fired the bullets found at the scene of the Warrington murder. Kramer stated that given the specific "groove" characteristics in the bullets, after reviewing Todd

Wharton's report and notes and Heather Williams's report and notes there was a Mac-10 style weapon on the list of possible candidate firearms that could have fired the bullets. Defense counsel objected to portions of this testimony.

{¶102} Before the defense cross-examined Kramer, defense counsel asked to break for the evening given what he termed the "surprise of the disclosure." Defense counsel argued that tying the rifling specifics on the bullets at the scene of the murder to the Mac-10 was a new issue to him and it was not disclosed in Kramer's report. The trial court then excused the jury for the night and at that time defense counsel moved for a mistrial, contending that Kramer's testimony went beyond the scope of his report.

{¶103} At that time defense counsel acknowledged that he had received Kramer's report and the reports from the prior analysts. However, defense counsel stated that he had never seen any list from any expert tying a Mac-10 style firearm to the bullets from the Warrington Murder scene. But, defense counsel did acknowledge that he was aware of Joey Moore's statement regarding a Mac-10.

{¶104} Defense counsel then contended that he could not properly cross-examine Kramer based on the new information. He indicated that he would need to get his own expert. The State, by contrast, indicated that the previous analysts' reports and the discussions regarding rifling grooves on the bullets should have put

defense counsel on notice, particularly when combined with Joey Moore's statement.

{¶105} The trial court inquired as to whether the defense had the candidate list of the firearms that BCI stated were possibly consistent with the rifling characteristics on the bullets, and defense counsel stated he did not. The State was then ordered to give the candidate list to the defense at that time. Court then recessed for the evening, and reconvened the following morning.

{¶106} On the morning of the seventh day of Carter's trial, defense counsel filed a written motion for a mistrial. The trial court heard arguments from both parties on the matter. Defense counsel again contended that the State had violated Crim.R. 16 by not disclosing the possible firearm candidate list, which contained over 130 firearms that could have fired the 9mm Luger rounds and created similar "lands and grooves" on the bullets that were found at the scene of the Warrington murder.

{¶107} Defense counsel also stated that he had contacted an expert who defense counsel thought could contradict the State's evidence, or at least indicate that the State's candidate list was overly broad and that the potential expert could possibly exclude the Mac-10 as a candidate. Defense counsel argued that he was prejudiced by the State's non-disclosure of the firearm candidate list.

{¶108} By contrast, the State argued that the defense was not unfairly surprised as the firearm candidate list was more akin to notes used in generating an expert report and thus was not required to be given under Crim.R. 16(D). The State maintained that the candidate list was simply a large list of possible firearms that could match the lands and grooves on the fired bullets, leading to Todd Wharton's stated conclusion that he could not match the bullets at the scene to a single specific firearm. Todd Wharton's report, which the trial court included as a court exhibit, contained the following language.

> **Examination of the evidence bullets * * * revealed that they are 9mm Luger caliber, full metal jacketed design, and fired from a barrel with conventional rifling consisting of six (6) lands and six (6) grooves, right-hand twist. Microscopic comparisons of the three (3) evidence bullets to each other revealed matching individual barrel engraved striations, confirming that the evidence bullets were fired from the same firearm. Further microscopic comparison of the evidence bullets to test fires from the Glock pistol, submitted as item #1, revealed dissimilar general rifling class characteristics (polygonal rifling versus conventional rifling). These findings confirm that the evidence bullets were not fired by the submitted pistol.**
>
> **The rifling specifications on the evidence bullets correspond to numerous brands of 9mm Luger caliber semi-automatic firearms.**
>
> **\* \* \***
>
> **Digital images of the individual characteristics present on the evidence cartridge case, submitted as item #4, have been entered into Ohio's computerized firearms identification system ("NIBIN/IBIS") and compared with images of all similar specimens currently on file. No identification was made at this time; however, the images will remain in the system and will be**

**routinely compared with all future images entered by any of the laboratories in the Ohio network.**

(Court Exhibit 1-M).

{¶109} The State argued that the analysts' reports contained the conclusions that were required to be turned over under Crim.R. 16 and that defense counsel was on notice and could have examined any of the experts related to what possible weapons matched the rifling characteristics on the bullets, particularly given that Wharton and Kramer's reports contained those rifling characteristics.

{¶110} Separately, the State argued that the demonstrative picture of a Mac-10 style firearm was listed as a potential exhibit to be presented at trial in the State's exhibit list, which was given to defense counsel just prior to trial. Specifically, the exhibit list indicates "Mac-10 Photo" with Kramer and C. Williams as the witnesses who would identify the exhibit. (Court's Ex. 1-M).

{¶111} After hearing the parties' arguments, the trial court proceeded to rule on the matter. The trial court indicated that it had reviewed the memorandum supporting defense counsel's motion for a mistrial, that it had reviewed what had been disclosed in discovery and what had not been disclosed, and that it had reviewed relevant case authority.

{¶112} The trial court then conducted its analysis on the record, stating that defense counsel did have Joey Moore's statement regarding the Mac-10, that it did have Todd Wharton's report indicating that there was a list of possible candidate

firearms but none of them could be specifically identified as the weapon used in the murder, and that defense counsel had information that other firearms could have fired the bullets.  What defense counsel did not have, was the actual list of candidate firearms (Defense Exhibit HH), which contained 131 possible matching firearms made by dozens of manufacturers.

{¶113} The court then made the following ruling.

**But, I find it's not necessarily a discovery violation not giving the defense exhibit 'HH' until yesterday because Mr. Wharton's report indicates that there was a list of guns that could have fired the casings that were tested.  The defendant knew of Mr. Wharton's report.  The defendant's counsel knew that Moore had said that the defendant had an unassembled Mac-10 at his house.  Therefore, since the defendant had Wharton's report and knew that there was evidence that the casings could have been fired from any number of guns, including a Mac-10, I find that failure to provide the full exhaustive hundred and thirty-one list is not a willful discovery violation.  It's more in the nature of notes or data that supports the conclusion in Wharton's report.**

**Did the defendant have prior discovery that the State would show a picture of the Mac-10?  Apparently at the very earliest would be on the day the trial started when the list of exhibits was provided.  I find that the picture is demonstrative or illustrative of what Moore said that the defendant told him, or that he heard the defendant say.  Demonstrative evidence is admissible if it satisfies the general standard of relevance set forth in Evidence Rule 401, if it is substantially similar to an object that it is intended to represent.**

(Trial Tr. at 1242-43).

{¶114} In sum, the trial court stated,

> **The defense had access to all B.C.I. reports. The defense had access to all the witnesses. If there is a violation I think the only violation here would be not giving the actual picture of the Mac-10, the purported Mac-10, State's Exhibit '139'. So with that in mind, finding that there has not been any other discovery violation, I'm going to exercise discretion.**

(*Id.* at 1243).

{¶115} The court thus found that there was no willful violation of the discovery rules by the State in this instance. Therefore, the court determined that the severe sanction of a mistrial was not appropriate. The court indicated that it had given defense counsel the evening to prepare for cross-examination of Kramer and that defense counsel had demonstrated that he was prepared to do so through his argument to the court in support of his motion for a mistrial. However, the court stated that if defense counsel needed a continuance when the trial reached the defense's case-in-chief to present an expert, the court would take that under advisement at that time. In addition, the court noted that it would give an instruction that the photograph of the Mac-10 style-weapon was merely a demonstrative exhibit.[17]

{¶116} Following the hearing on the mistrial, trial resumed and defense counsel cross-examined Kramer. On cross-examination Kramer indicated that an actual "Mac-10" was not on the candidate firearm list, but two manufacturers made

---

[17] The trial court did give a generic instruction regarding demonstrative exhibits.

a firearm similar to the Mac-10, and they were on the candidate list. Kramer also acknowledged that over 130 different 9mm firearms could have fired the bullets that were located at the Warrington murder and if Kramer was shown a demonstrative photograph of each and every one of them he would agree that they were all consistent with the rifling pattern of the bullets from the scene of the Warrington murder.

Carter's Argument on Appeal and Analysis

{¶117} Carter now renews his argument on appeal that the trial court should have granted his motion for a mistrial and that the State committed discovery violations. Carter argues that Crim.R. 16(K) requires an expert to produce a report summarizing his testimony and he contends that Kramer's report only summarized part of his testimony. In addition, Carter argues that there is actually little validity to the science behind Kramer's testimony. Carter argues that various publications have questioned the validity of comparing a bullet collected at a crime scene to a fired bullet in a lab and that such an analysis does not reach the level of rigor to be considered scientifically viable. Finally, Carter argues that defense counsel had indicated he had been in contact with an expert who had said that he would undermine the State's ballistic evidence had defense counsel been aware of the Mac-10 information.

{¶118} In our own review of the trial court's decision on this matter, we would begin by noting that the trial court was very thorough in addressing these issues. The trial court also prepared a thorough record, having the referenced ballistic expert reports and the "candidate list" included in the record as court exhibits separate from the trial, many of which may not have otherwise been included. In addition, the trial court also held lengthy arguments on these issues and clearly considered the record and some relevant caselaw.

{¶119} Dealing first with the purported discovery violations, we cannot find that the trial court abused its discretion. Defense counsel was in possession of Joey Moore's statement regarding a Mac-10 and defense counsel also did have the reports from the analysts indicating that a number of potential firearms could cause similar groove patterns on the bullets in this case. A Mac-10 style weapon was one of over 130 of those firearms and Kramer, the expert, could only say that the Mac-10 style was one of many possible candidates. Defense counsel thus did receive a summary of the experts' findings and was clearly aware that a Mac-10 style firearm was a weapon that Carter was alleged to be in possession of. Moreover, defense counsel was able to effectively cross-examine Kramer on the issue given the extra night to prepare.

{¶120} As to the demonstrative photograph of a Mac-10 style firearm, defense counsel was provided with an exhibit list indicating that the photograph

would be used. While the State should still have provided the defense with the actual photograph, defense counsel did have the ability to ask for it. Similarly defense counsel did not object to the use of the demonstrative photo with a prior witness and was aware of it at that time, prior to Kramer's testimony. Again, defense counsel was also aware of the possibility of reference to a Mac-10 given that Joey Moore was set to be a witness at trial.

{¶121} Given the trial court's familiarity with the case and its analysis of the issue, we cannot find that the trial court abused its discretion in finding that there was no discovery violation, or that if there was it was not serious enough to warrant a mistrial. Mistrials are to be granted only in exceptional circumstances, and we cannot find given the specific facts before us that the trial court abused its discretion in declining to grant Carter's motion for a mistrial, even if there were some discovery irregularities. Therefore, Carter's second assignment of error is overruled.

### *Fourth Assignment of Error*

{¶122} In Carter's fourth assignment of error, he argues that the prosecutor committed misconduct during closing arguments. Specifically, Carter argues that the prosecutor misstated evidence and that the State attempted to shift the burden of proof to the defense. In addition, Carter argues that the cumulative discovery violations constituted prosecutorial misconduct.

Standard of Review

**{¶123}** Prosecutorial misconduct is generally not grounds for reversal unless it so taints the proceedings as to deprive the defendant of a fair trial. *State v. Johns*, 3d. Dist. Seneca No. 13-04-23, 13-04-24, 13-04-25, 2005-Ohio-1694, ¶ 25. Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464 (1986). "In making this determination, an appellate court should consider several factors: (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton*, 102 Ohio App.3d 28, 41 (8th Dist.1995).

**{¶124}** Furthermore, as to prosecutorial misconduct allegations related to closing arguments, "[p]arties have wide latitude in their closing statements, particularly 'latitude as to what the evidence has shown and what inferences can be drawn from the evidence.' " *State v. Wolff*, 7th Dist. Mahoning No. 07MA166, 2009-Ohio-7085, at ¶ 13, quoting *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-

6266, at ¶ 213. A prosecutor may comment upon the testimony of witnesses and suggest the conclusions to be drawn. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, at ¶ 116.

Alleged Improper Statements in Closing Arguments

**{¶125}** Carter first argues that during its rebuttal closing argument the State made an improper statement related to the expert testimony of Matthew Congleton, who had performed the GSR testing in this case. Carter claims that the following statement during the prosecutor's rebuttal closing argument was improper.

> **Now, there was not gunshot residue found on that car. True. But, Mr. Congleton told you that gunshot residue does not stick to smooth surfaces. If there was any on Mr. Carter's bare hands and then transferred to that door handle it probably wouldn't stick to that door handle. If it did, it may have blown away in the wind as Mr. Carter drove.**
>
> **[DEFENSE COUNSEL]: Objection. That was not the expert's testimony.**
>
> **THE COURT: Well, the jury can remember what the testimony was. This is argument. It's not evidence.**

(Trial Tr. at 1812).

**{¶126}** Carter contends that a "fair review" of Congleton's testimony shows that Congleton did not make any statements as to GSR blowing away as Carter drove away. Contrary to Carter's argument, a "fair review" of the prosecutor's statement indicates that the prosecutor was suggesting something that "may" have happened. The prosecutor was not indicating that the GSR expert actually did testify that the

GSR likely blew off of the vehicle. Rather the prosecutor was making an inference based on Congleton's testimony. Congleton actually did testify that "[a] smoother object obviously would have less adhesion power—it would give the particles less stick-to-itiveness than a rougher surface." (Trial Tr. at 1135). Congleton also testified that, "[g]enerally speaking * * * [t]he more an object or person moves, or it rubs up against something or themselves, the more likely you will have gunshot residue shed and continue to be shed from whatever surface it might be." (*Id*. at 1136). Thus the prosecutor's statement is a fair inference made from the evidence.

**{¶127}** Finally, even if the statement was somehow error, which we do not find that it is, the jury was clearly instructed that closing arguments were not evidence and we presume the jury followed that instruction. Thus Carter's argument on this issue is not well-taken.

**{¶128}** Carter next argues that the following statement made during the State's rebuttal closing argument was improper.

> **[PROSECUTOR]: [Defense Counsel] also said, "Well, maybe that gunshot residue got on those clothes," not one article, and not two articles, but three articles of clothing collected from the defendant's house, "got on those clothes at the Police station." Maybe. Maybe. Okay, now we have two possibilities. I would submit to you that the more possibilities we have the more likely it is that each one of them is a mere possibility. Okay? Well, maybe. Maybe. Maybe just isn't good enough. Maybe doesn't get you to reasonable doubt. The jury instructions tell you that.**

> **[DEFENSE COUNSEL]: Objection, Your Honor. He's reversing the burden of proof. Maybe doesn't get you reasonable doubt is reversing the burden of proof in this case.**
>
> **[PROSECUTOR]: I'm speaking directly to the jury instructions that talks specifically about mere possible doubt.**
>
> **[THE COURT]: Okay. The Statement you just made I'll sustain and tell the jury to disregard. But, continue.**
>
> **[PROSECUTOR]: Okay.**
>
> **THE COURT: The State has the burden of proof.**

(Trial Tr. at 1808-1809).

{¶129} Here, clearly the trial court *sustained* an objection and the jury was instructed to disregard. We must presume that the jury followed the court's instructions, particularly given that shortly thereafter the jury was specifically instructed on reasonable doubt as follows.

> **Reasonable doubt is present when, after you have carefully considered and compared all of the evidence, you cannot say you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not a mere possible doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such a character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs.**
>
> **If, after a full and impartial consideration of all of the evidence, you are firmly convinced of the truth of the charge the State has proved its case beyond a reasonable doubt. If you are not firmly convinced of the truth of the charge you must find the defendant not guilty.**

(Trial Tr. at 1830-31).

{¶130} Given that the trial court sustained the objection to the prosecutor's statement, that the trial court gave thorough instructions related to reasonable doubt, and given our presumption that the jury followed the trial court's instructions, we can find no error here, let alone prejudicial error.

{¶131} Next, Carter argues that the prosecutor committed error in making the following statement in rebuttal closing argument.

> **Also with respect to Sonya [Defense Counsel] brings up the idea that she was with a lot of other men.  Well, we know of one other than Mr. Warrington and that would be Arguello Harris.  Okay? I don't know that there was any evidence of a lot of other men. But, again, even assuming there were other men, is it just a mere possibility that some other man did this?  Because a mere possibility does not rise to a level of reasonable doubt.**
>
> **[DEFENSE COUNSEL]:  Objection, your Honor. It's shifting the burden.**
>
> **THE COURT:  The Court will remind the jurors, and I'll tell you in the instructions, it's the State's burden to prove.**

(Trial Tr. at 1817).

{¶132} Here, the state's indication that a mere possibility does not rise to the level of reasonable doubt is straight out of the jury instructions.  Again the court also provided specific instructions related to reasonable doubt.  We can find no error here, let alone prejudicial error.

{¶133} Next, Carter argues that the following statement of the prosecutor during rebuttal closing argument was error.

> **Now, Carlotta. [Defense Counsel] said something with respect to Carlotta and this is very important. He said – [Defense Counsel] suggested that Mr. Carter was not trying to set up an alibi because he was guilty, but because maybe he was innocent and the alibi was true.**
>
> **[DEFENSE COUNSEL]: Objection. That's not what I said.**
>
> **THE COURT: It's just argument. The jury will decide what the evidence is. Overruled.**

(Trial Tr. at 1826).

{¶134} It appears that the prosecutor's statement in rebuttal closing argument was in reference to the following portion of defense counsel's closing argument.

> **Carlotta, when asked by the Prosecutor, said this whole thing about this alibi stuff. It wasn't meant by Markelus because he was guilty and he was trying to create a falsehood to get out of it. Markelus Carter feels, and felt, like the system wasn't going to give him a fair shake and he needed extra help to do it.**

(Trial Tr. at 1803).

{¶135} While the prosecutor's characterization of what defense counsel said in rebuttal closing argument was not entirely accurate, we cannot find that it was an unfair characterization of the evidence or that it in any way prejudiced the outcome of the trial or rose to the level of prosecutorial misconduct. Thus Carter's arguments related to statements made during the prosecutor's rebuttal closing statements are not well-taken.

{¶136} Finally, Carter argues summarily in two sentences in his brief that the State's discovery violations and improper arguments cumulatively constitute reversible error. We found no error in closing arguments and although there were discovery irregularities in this case, we cannot find that anything here rose to the level of prosecutorial misconduct. Thus there is no basis for cumulative error. Therefore, Carter's fourth assignment of error is overruled.

### *Fifth Assignment of Error*

{¶137} In Carter's fifth assignment of error, he argues that he received ineffective assistance of counsel. Specifically, he contends that defense counsel poorly handled the government firearms expert, Kramer, and that defense counsel failed to adequately investigate the possibility of a Mac-10 style weapon being involved in this case.

Standard of Review

{¶138} To establish his claims on appeal, Carter must show that trial counsel's performance was deficient and that counsel's deficient performance prejudiced him. *State v. Jackson,* 107 Ohio St.3d 53, 2005–Ohio–5981, ¶ 133, citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley,* 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same

order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

Purported Ineffective Assistance and Analysis

{¶139} Carter contends that if the State is to be believed that defense counsel should have been on notice from discovery that a Mac-10 style firearm would be painted as the alleged murder weapon, then defense counsel was ineffective for failing to adequately investigate the matter. In addition, Carter contends that defense counsel failed to call an expert related to ballistics despite indicating on the record that he had been in contact with one.

{¶140} Contrary to Carter's arguments, there is no evidence in the record that his trial counsel could have called a witness to dispute Kramer's testimony. Multiple days before Carter presented his case-in-chief, the trial court addressed Carter's motion for a mistrial related to discovery matters, which was discussed in the second assignment of error. As defense counsel argued for a mistrial, he indicated that he had been in contact with an expert and the expert would look into the matter and the expert gave some brief opinions on the matter over the phone, but it did not appear that the expert had actually reviewed the ballistic evidence yet based on Carter's counsel's representations. Although it overruled Carter's motion for a mistrial, the trial court indicated that it would consider granting Carter a continuance when the trial reached his case-in-chief if Carter needed to bring in an

expert, but defense counsel never requested such a continuance. In fact, defense counsel did not suggest at any point later in the trial that he had received further word from the expert and would like to call the expert to testify.

{¶141} On appeal, Carter would have us find, without any facts to support it, that his counsel was ineffective for failing to investigate, request a continuance, or call an expert when there is no indication that a ballistic expert would actually have been able to meaningfully contradict testimony by the State. It is equally likely, though equally uncertain, that the expert reviewed the evidence and could not provide any exculpatory testimony. Carter would have this Court engage in pure speculation that some expert existed who would have provided exculpatory testimony related to ballistics that would somehow overcome the mountain of other circumstantial evidence against him.

{¶142} Moreover, even if Carter could produce evidence disputing the State's expert that a Mac-10 style firearm was one of over 130 firearms that could match the groove patterns on the bullets found at the Warrington murder scene, such testimony would only call into question the type of firearm used in the murder, not the murder itself. Thus we cannot find any prejudicial error here.

{¶143} This is particularly true given that Carter's trial counsel was able to effectively cross-examine the State's expert and have him admit that the bullet grooves matched with over 130 weapons, giving little weight to his assertion that

the Mac-10 style weapon was one of many possible firearms. For these reasons, Carter's fifth assignment of error is overruled.

### *Conclusion*

{¶144} For the foregoing reasons Carter's assignments of error are overruled and the judgment of the Allen County Common Pleas Court is affirmed.

*Judgment Affirmed*

**PRESTON, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**